UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LOUISE M. MCCARTHY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 09-10161-PBS |
| THE COMMERCE GROUP, INC. | ) | |
| and MAPFRE, S.A., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION ON CROSS-MOTIONS OF PLAINTIFF AND CGI FOR SUMMARY JUDGMENT

June 9, 2011

DEIN, U.S.M.J.

## I. INTRODUCTION

The plaintiff, Louise M. McCarthy ("Ms. McCarthy"), was formerly the Senior Vice President, Senior Counsel and Assistant Secretary of defendant, The Commerce Group, Inc. ("CGI"). On June 4, 2008, CGI merged with defendant Mapfre, S.A. ("Mapfre"), and was transformed from a stand-alone, publicly traded domestic entity into a private, wholly-owned subsidiary of a foreign corporation.[1] On June 5, 2008, one day after the merger, Ms. McCarthy submitted a Notice of Intent to Resign for Good Reason ("Notice") to CGI in which she informed the company that she intended to resign from her position for "Good Reason" pursuant to the terms of her Employment Agreement

_____

[1] On January 1, 2010, CGI changed its name to MAPFRE USA Corp. However, this court will continue to refer to that entity as CGI to avoid confusion with the parent corporation, MAPFRE, S.A.

dated September 7, 2007, and her 2006 and 2007 Incentive Award Agreements. In this action, Ms. McCarthy claims that CGI and Mapfre breached their contractual obligations under the Employment and Incentive Award Agreements, and failed to act in good faith, by denying her Good Reason claim and refusing to pay her approximately $4.5 million in severance pay and benefits under the Employment Agreement.

All parties have filed motions for summary judgment. This Report and Recommendation will address the cross-motions of McCarthy and CGI for summary judgment with respect to all the claims against CGI only. Both parties contend that they are entitled to summary judgment on all counts of the complaint directed to CGI, which includes counts for breach of contract (Count I), declaratory judgment (Count II), breach of duty of good faith and fair dealing (Count III) and recovery of benefits under ERISA (Count V). As detailed herein, this court concludes that the Employment Agreement is governed by ERISA, that CGI is entitled to summary judgment with respect to Counts I and III of the complaint, but that disputed issues of fact preclude summary judgment for either party with respect to Counts II and V. Therefore, and for all the reasons set forth below, this court recommends to the District Judge to whom this case is assigned that CGI's Motion for Summary Judgment (Docket No. 63) be ALLOWED IN PART and DENIED IN PART, and that Ms. McCarthy's Motion for Summary Judgment (Docket No. 55) be DENIED with respect to all of the claims against CGI.

## II.  **STATEMENT OF FACTS**

### **Scope of the Record**

In connection with the pending motions, the parties have filed over 200 exhibits and have submitted statements pursuant to Local Rule 56.1 containing hundreds of paragraphs of asserted facts.  Nearly all of the material facts have been disputed, at least in part, or otherwise objected to.  Consequently, this court has not attempted to describe all of the relevant facts or to provide details of the parties' factual disputes.  Instead, the Statement of Facts is limited to those facts that explain the critical issues in this case.  This recitation compels the conclusion that summary judgment is not appropriate for either CGI or Ms. McCarthy on the ERISA-related Counts of the plaintiff's complaint.

### **The Relevant Agreements**

Ms. McCarthy, an attorney, was Senior Counsel of CGI from the time when she was hired in September 2001, until she resigned effective July 7, 2008.  In addition, in August 2006 she was promoted to the position of General Counsel to CGI's insurance subsidiaries, and became Senior Vice President and Assistant Secretary of CGI.  She reported to James Ermilio, who was the General Counsel of CGI during Ms. McCarthy's entire tenure.  In 2006, he also added the title of Executive Vice President of CGI.

It is undisputed that CGI's merger with Mapfre constituted a "Change in Control" under two types of agreements between CGI and its officers, directors and/or executive

employees: their Incentive Award Agreements and their Employment Agreements.[2]

Specifically, CGI's officers, directors and senior management employees, including Ms.

McCarthy, were subject to an Amended and Restated Incentive Compensation Plan dated

May 17, 2002 (the "Plan"), pursuant to which they could be granted awards over and

above their salaries.[3]  Under the Plan, Ms. McCarthy could be granted awards each year,

payable three years after the grant, the terms of which would be reflected in a separate

agreement.  (See Plan § 13.2).  In this litigation, Ms. McCarthy is seeking the amounts

allegedly due to her under her 2006 and 2007 Incentive Award Agreements ("IAA") with

CGI.[4]  These Agreements provide protection for employees who resign for "Good

Reason" as defined therein.  Ms. McCarthy contends, and CGI denies, that her

resignation was for Good Reason and due to:

> (i) a substantial and adverse alteration in the nature, status, or
> prestige of the Officer's responsibilities, title, authority, powers,
> functions, duties or reporting requirements, taken as a whole, as
> compared to the Officer's responsibilities, title, authority, powers,
> functions, duties or reporting requirements, taken as a whole,
> immediately prior to the Change in Control.

---

[2]  While the Incentive Award Agreements contain the term "Change in Control," the Employment Agreements refer to a "Change of Control."  Nevertheless, there is no relevant distinction between the terms for purposes of this decision, as both are defined to include a merger.

[3]  A copy of the Plan can be found at CGI Exhibit ("CGI Ex.") 26, which is included in Docket No. 66.

[4]  A copy of the 2006 Incentive Award Agreement can be found at CGI Ex. 19, and a copy of the 2007 Incentive Award Agreement can be found at CGI Ex. 20.

(2006 & 2007 IAA § 5.4.3(i)).[5]  The key factual issue in this case is whether

Ms. McCarthy's responsibilities stemming from CGI's status as a publicly traded

corporation were a core component of her job, as Ms. McCarthy contends, or were

insignificant to her position, as CGI contends.

At about the time CGI entered merger negotiations with Mapfre, CGI's Board of

Directors authorized the Company to enter into Employment Agreements with eleven of

its key Executive Officers.  Ms. McCarthy entered into an Employment Agreement dated

as of September 7, 2007 ("EA"),[6] which provides for a significant severance payment, as

well as life and health insurance benefits, if she resigns from employment for "Good

Reason."  (EA §§ 3(e)-(f)).  The Employment Agreement provides for a more generous

severance payment, and more extensive benefits, if Ms. McCarthy's resignation occurs

within three years following a "Change of Control," including a merger.  (See EA §§ 3(f)

& 8).  Like the Incentive Award Agreements, under the Employment Agreement "Good

Reason" is defined in relevant part as:

> (i) a substantial and adverse alteration in the nature, status, or
> prestige of the Executive's responsibilities, title, authority, powers,
> functions, duties or reporting requirements, taken as a whole[.]

---

[5]  Other "Good Reasons" include reductions in compensation and benefits, reductions in
facilities and perquisites, the Company's relocation, or breach by the Company of material
obligations owed to the Executive.  (IAA §§ 5.4.3(ii)-(vii)).  These provisions are not presently at
issue.

[6]  A copy of Ms. McCarthy's Employment Agreement is attached to the Exhibits in
Support of Plaintiff's Motion for Summary Judgment ("Pl. Ex.") (Docket No. 58) as Pl. Ex. 1(A).

(EA § 8).[7]  However, under the Employment Agreement "the determination of Good Reason [is to] be made, at the Executive's election, relative to conditions existing immediately prior to the commencement of [an agreement resulting in a Change in Control]."  (EA § 3(c)(iii)).  A determination of "Good Reason" under the Incentive Award Agreements is "conclusive and binding" for purposes of the Employment Agreement, and vice versa.  (EA § 3(m)).

## Ms. McCarthy's Notice of Intent to Resign

Pursuant to her Employment Agreement, Ms. McCarthy was obligated to give notice of her intention to resign for Good Reason.  Thus, the Employment Agreement provides in relevant part:

> Notwithstanding any provision of this Agreement to the contrary, in no event shall "Good Reason" be deemed to exist unless the Executive shall have given the Company written notice before the Executive's voluntary resignation and not more than three (3) months after the Executive first has actual knowledge of the facts and circumstances allegedly constituting Good Reason within the meaning of this Section 3(c)(iii), and that within twenty (20) days after receipt of such notice, the Company and its subsidiaries, as applicable, shall not have rescinded or otherwise cured, and held the Executive harmless against, each of the events cited in the Executive's notice as a basis for Good Reason.

(EA § 3(c)(iii) (emphasis added)).  Ms. McCarthy gave written notice on June 5, 2008, the day after the merger took place, of her intention to resign for Good Reason effective

---

[7]  The Employment Agreement contains the other definitions of Good Reason found in the Incentive Award Agreements.  See note 5, supra.

as of the close of business on July 7, 2008 (the "Notice").[8]  She opted to compare the job

she held on June 5, 2008 to the job she had held from August 2006 through October 30,

2007 pursuant to § 3(c)(iii) of the Employment Agreement.  In her Notice she asserted

that as a result of the merger "the nature, status, and prestige of Ms. McCarthy's responsi-

bilities and functions are substantially and adversely altered.  The core duties and

functions assumed by Ms. McCarthy as counsel to a public company no longer exist.

The nature and prestige associated with her position have been eliminated."  (Notice at

2).  Ms. McCarthy further asserted that "her core responsibility as Senior Counsel to CGI

. . . was defined by the fact that CGI was a public company" and went on to list specific

ways in which her position had and would change.  (Id. at 2-3).  The day after she

submitted her Notice of Intent to Resign, James Ermilio, General Counsel of CGI,

submitted his own notice, claiming that following the merger with Mapfre, he had "Good

Reason" to resign from the company as well.  (Pl. Ex. 79).

## CGI's Response to the Notice

It is undisputed that following its receipt of Ms. McCarthy's Notice, CGI under-

took an investigation into the merits of her Good Reason claim.  Many of the facts

relating both to the scope of the investigation undertaken by CGI and its conclusions are

in dispute.  Consequently, as detailed below, this court concludes that a trial is necessary

to assess whether CGI's actions were reasonable.  It is undisputed, however, that by letter

---

[8]A copy of Ms. McCarthy's Notice is located at Pl. Ex. 1(F).

dated June 25, 2008, 20 days after Ms. McCarthy submitted her Notice, CGI's Board of Directors and Executive Compensation Committee voted to reject Ms. McCarthy's claim that her resignation was for Good Reason.

There is evidence in the record that after the Chief Executive Officer of CGI, Gerald Fels, received Ms. McCarthy's Notice on June 5, 2008, he, along with the Board of Directors of CGI, established a group to address Ms. McCarthy's claim of Good Reason. The group consisted of Mr. Fels and other individuals who had been appointed to the Board by Mapfre. (See CGI Ex. 58; PF ¶¶ 119-21; DR ¶¶ 119-21).[9] Ms. McCarthy has put forth evidence that Mr. Fels contacted Andres Jimenez of Mapfre as well as Mapfre's counsel, Claudio Ramos, for direction on how to proceed. Mr. Fels allegedly assured Mr. Jimenez that he would have his full support to get the matter resolved "on Mapfre's terms," and also warned Mr. Jimenez that they had to "consider the consequences" if they gave in to Ms. McCarthy's demands. (Pl. Ex. 11 at 240-42; Pl. Exs. 76 & 78). Those "consequences" allegedly included the fact that CGI could face over $60 million in severance liability if each of its key executive officers made similar Good Reason claims under their Employment Agreements, and could face over $100 million in liability if, in addition, each of CGI's non-Section 16 officers made Good

_____

[9] "PF" refers to the Statement of Undisputed Facts in Support of Plaintiff's Motion for Summary Judgment (Docket No. 57). "DR" refers to the Defendants' Joint Response to Plaintiff's Statement of Undisputed Facts and Defendants' Statement of Additional Facts (Docket No. 103).

Reason claims under the Company's Severance Plan. (<u>See</u> PF ¶ 157; DR ¶ 157; Pl. Ex. 83).

Ms. McCarthy also has put forth evidence that upon Mapfre's recommendation, Mr. Fels hired Mapfre's counsel, the law firm of KattenMuchinRosenman LLP ("Katten"), to investigate Ms. McCarthy's Good Reason claim. Marc Tract, the Katten partner in charge of the investigation, sat on the Board of Mapfre's Florida subsidiary, and had represented Mapfre in connection with regulatory work for certain of its U.S. subsidiaries. (Pl. Ex. 11 at 264; Pl. Ex. 46 at 157). Moreover, although Mr. Tract was hired by Mr. Fels, there is evidence in the record indicating that Mapfre's counsel, Mr. Ramos, directed Katten's work and instructed Katten on how to proceed.[10] (Pl. Ex. 46 at 158-59). Such evidence, if believed, would undermine any suggestion that Katten was acting as an "independent" investigator.

It is undisputed that Katten elected not to interview either Ms. McCarthy or Mr. Ermilio. (<u>See</u> PF ¶ 166; DR ¶ 166). While CGI argues that this decision was made necessary by the fact that they had both asserted Good Reason for their resignation, a contrary argument could be made that it rendered any investigation incomplete since

---

[10] There also is evidence in the record which suggests that Katten was acting as counsel to Mapfre when it performed the investigation into Ms. McCarthy's Good Reason claim. Specifically, the record indicates that during the deposition of Mr. Jimenez, defense counsel instructed the witness not to answer when asked what Mr. Ramos instructed Katten to do with respect to the investigation. (<u>See</u> Pl. Ex. 46 at 158-59). A factfinder may conclude from this instruction that Mapfre and Katten had an attorney-client relationship, and that Katten was acting on Mapfre's behalf when it investigated Ms. McCarthy's Good Reason claim.

these were the two individuals with the most knowledge concerning their job responsibilities. According to Ms. McCarthy, this decision also resulted in Katten's failure to review significant amounts of material. For example, but without limitation, in order to determine the scope of work undertaken by Ms. McCarthy which related to the fact that CGI was a publicly traded corporation, Katten reviewed a number of documents, including Ms. McCarthy's emails. However, since Ms. McCarthy was not consulted about where the relevant information existed, and was not told what information was, in fact, reviewed, Katten allegedly failed to review any of the documents contained on the "H" drive, which was used primarily for Board-related documents. (See Pl. Ex. 2 ¶ 42; CGI Ex. 56 at 4).

Ms. McCarthy also asserts that false information was provided to the Board when it considered her Good Reason claim. For example, but without limitation, Katten provided the Board with a written report dated June 18, 2008, which purports to summarize its investigation, and which is written as if it is the Board's report of a meeting which is being held "to determine whether Mr. Ermilio and Ms. McCarthy have 'Good Reason' as a result of the changes in their positions arising in connection with the Merger." (CGI Ex. 56 at 2). Therein, Katten repeatedly reported that Ms. McCarthy and Mr. Ermilio had "unfortunately" "declined the Company's invitation to participate in the meeting, making it difficult to actually explore their allegations in further detail." (Id. at 4; see also id. at 6). However, Ms. McCarthy strenuously denies that she declined to participate in the

Board meeting at which her Notice would be considered, or otherwise failed to cooperate in the process. (PF ¶¶ 167-71a).

The decision on Ms. McCarthy's Good Reason claim was made at a special meeting of CGI's Board of Directors and Executive Compensation Committee, which took place on June 25, 2008. Prior to the meeting, the members of the Board had Katten's report of June 18, 2008. (CGI Ex. 58 at 2). The minutes of the meeting reflect that it took place at Mapfre's headquarters in Spain, and that half of the attendees participated by telephone. (Id. at 1). Both Ms. McCarthy and her attorney were allowed to make a presentation, after which no questions were asked. After Ms. McCarthy and her counsel were excused from the meeting, Mr. Fels made a presentation concerning Ms. McCarthy's alleged role at the Company, and the alleged nature and extent of her responsibilities there. Significantly, Mr. Fels stated that the plaintiff had no responsibilities specifically related to CGI's status as a publicly traded Company, and he opined that Ms. McCarthy had no factual basis for claiming she had Good Reason to resign. (Id.). At no time was Ms. McCarthy given the opportunity to confront Mr. Fels or to clarify any misstatements she believed he had made. Thereafter, the vote was taken to reject her contention that her resignation was for Good Reason.[11] (Id.).

Ms. McCarthy has put forth additional facts which further call into question the sufficiency of the procedure used by Katten and CGI to evaluate her Good Reason claim.

---

[11] The Board also rejected Mr. Ermilio's Notice of Good Reason, but subsequently reached an agreement resolving the dispute with him.

For example, despite Mr. Fels' statement to the Board that Ms. McCarthy had no responsibilities related to CGI as a publicly traded company, he back-tracked from that position during his deposition. (See Pl. Ex. 11 at 92-96, 100-04). Moreover, during his deposition, Mr. Ermilio testified that Ms. McCarthy had significant responsibilities relating to CGI's status as a publicly traded company. (See Pl. Ex. 7 at 72-80, 84-85, 110-13, 238-41). Thus, if Katten or the Board had spoken to Mr. Ermilio at the time they were investigating Ms. McCarthy's Good Reason claim, they likely would have heard a far different description of Ms. McCarthy's job responsibilities than the one provided by Mr. Fels.[12]

Finally, Ms. McCarthy takes exception to the definition of "Good Reason" that Mr. Tract provided to the Board at the time it was considering her claim. Specifically, Mr. Tract informed the Board that the Good Reason provision required a showing of a "substantial and adverse alteration" in each and every one of the listed factors, "taken as a whole." (CGI Ex. 58 at 3). Therefore, according to the plaintiff, Mr. Tract read the word

---

[12]   The defendants have filed a Declaration of James Ermilio in connection with these summary judgment motions. (CGI Ex. K). While not directly contradicting his deposition testimony, in his Declaration Mr. Ermilio attempts to minimize Ms. McCarthy's public company work at CGI. For example, but without limitation, Mr. Ermilio states that he "remained the ultimately responsible lawyer at CGI" with respect to the duties and functions identified in Ms. McCarthy's Notice regarding her public company-related work, and that such duties and functions "were a relatively small component of [the plaintiff's] overall duties and responsibilities." (CGI Ex. K ¶¶ 5, 6). However, it cannot go unnoticed that at the time of his Declaration, Mr. Ermilio had reached a settlement with CGI in which he agreed to cooperate with CGI in litigation against the Company. (See Memorandum of Decision and Order on Parties' Motions to Strike at 10-11). Thus, an inference can be drawn that if Mr. Ermilio had been interviewed at the time of Katten's investigation, he would have provided information more consistent with his deposition testimony and supportive of Ms. McCarthy's Good Reason claim.

"or" out of her contractual agreements. CGI contends that the standard presented by Mr. Tract was complete and accurate.

This litigation followed the Board's decision to reject Ms. McCarthy's Notice of Good Reason. Additional facts will be provided below where appropriate.

### III. ANALYSIS

#### A. Summary Judgment Standard of Review

Summary judgment is appropriate when the moving party shows, based on the discovery, affidavits and other materials on file, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996) (quotations and citations omitted). A material fact is one which has "the potential to affect the outcome of the suit under the applicable law." Id. (quotations and citations omitted). In order to defeat the entry of summary judgment, the nonmoving party must submit "sufficient evidence supporting the claimed factual dispute to require a choice between the parties' differing versions of the truth at trial." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (internal citations and quotations omitted), cert. denied, 511 U.S. 1018, 114 S. Ct. 1398, 128 L. Ed. 2d 72 (1994). However, the court will not consider "conclusory allegations, improbable inferences, and unsupported speculation." Galloza v. Foy, 389 F.3d 26, 28 (1st Cir. 2004) (quotations and citation omitted).

"Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Int'l Group, Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001). "When facing cross-motions for summary judgment, a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56." Dan Barclay, Inc. v. Stewart & Stevenson Servs., Inc., 761 F. Supp. 194, 197-98 (D. Mass. 1991).

## B.    Existence of an ERISA "Plan"

A threshold issue raised by the parties' motions for summary judgment is whether the Employment Agreement constitutes a "plan" under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 et seq. ("ERISA").[13]  It is undisputed that if Ms. McCarthy's claims in this action relate to an ERISA-covered plan, her state law claims will be preempted by federal law, and she will have no right to a jury trial.  For the

---

[13]  Although CGI has asserted that the Employment Agreement and the Incentive Award Agreements collectively constitute an ERISA plan, this court has limited its ERISA analysis to the Employment Agreement.  Incentive programs such as the one established by CGI's 2002 Amended and Restated Incentive Compensation Plan and the Incentive Award Agreements entered into thereunder, which provide discretionary bonuses designed to retain and motivate employees during the course of their service to the employer, do not constitute employee benefit plans under ERISA.  See, e.g., Oatway v. Am. Int'l Group, Inc., 325 F.3d 184, 188-89 (3d Cir. 2003) (finding that discretionary stock options given in recognition of plaintiff's service to employer, and awarded in addition to plaintiff's regular compensation, were not employee welfare benefits or employee pension benefits under ERISA); Inman v. Klockner-Pentaplast of Am., Inc., 467 F. Supp. 2d 642, 650-53 (W.D. Va. 2006) (describing case law and holding that plaintiff's stock purchase incentive plan was not an ERISA-covered plan).

reasons that follow, this court concludes that the Employment Agreement is an employee benefit plan under ERISA.

**Legal Framework**

ERISA's coverage is limited to employee benefit "plans," but "[t]he text of ERISA itself affords scant guidance as to what constitutes a covered 'plan.'" Belanger v. Wyman-Gordon Co., 71 F.3d 451, 454 (1st Cir. 1995). Consequently, the court must look to case law to determine whether the Employment Agreement falls within the scope of ERISA. As detailed below, the critical issue is whether the Employment Agreement requires an "ongoing administrative program for processing claims and paying benefits." Ms. McCarthy's Employment Agreement requires such a program.

The leading case on what constitutes an ERISA plan is Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 12, 107 S. Ct. 2211, 2218, 96 L. Ed. 2d 1 (1987). See Belanger, 71 F.3d at 454 ("*Fort Halifax* is the beacon by which we must steer"). Therein, the Supreme Court held that a Maine statute requiring employers to provide a one-time severance payment to employees in the event of a plant closing was not preempted by ERISA. Fort Halifax, 482 U.S. at 3-4, 107 S. Ct. at 2213-14. Significantly, the Court determined that "[t]he Maine statute neither establishe[d], nor require[d] an employer to maintain, an employee benefit *plan*" because it involved nothing more than "a one-time, lump-sum payment triggered by a single event[.]" Id. at 12, 107 S. Ct. at 2218. As the Court stated,

> [t]o do little more than write a check hardly constitutes the operation
> of a benefit plan. Once this single event is over, the employer has no
> further responsibility. The theoretical possibility of a one-time

obligation in the future simply creates no need for an ongoing
administrative program for processing claims and paying benefits.

Id. (footnote omitted).

In reaching its conclusion that the statute at issue was not an ERISA plan, the

Supreme Court was mindful of Congress' purposes in enacting ERISA.  See id. at 11, 107

S. Ct. at 2217.  Those purposes include the desire to protect employers from a

"patch work scheme" of employee benefit regulations and, more importantly, the desire

"to safeguard the financial integrity of employee benefit funds, to permit employee

monitoring of earmarked assets, and to ensure that employers' promises are kept."

Belanger, 71 F.3d at 454 (describing Fort Halifax) (internal quotations omitted).  The

Fort Halifax Court found that neither purpose was implicated by a one-time payment

obligation.  Id. (citing Fort Halifax, 482 U.S. at 16, 107 S. Ct. at 2219-20).  However, it

concluded that ERISA's purposes were implicated by administrative programs involving

"ongoing investments and obligations" that create "a need for financial coordination and

control" and "are uniquely vulnerable to employer abuse or employer carelessness[.]"  Id.

(internal quotations omitted).

Following Fort Halifax, the First Circuit has determined that "the existence of a

plan turns on the nature and extent of an employer's benefit obligations."  Belanger, 71

F.3d at 454.  "Those obligations are the touchstone of the determination: if they require

an ongoing administrative scheme that is subject to mismanagement, then they will more

likely constitute an ERISA plan; but if the benefit obligations are merely a one-shot, take-

it-or-leave-it incentive, they are less likely to be covered." O'Connor v. Commonwealth

Gas Co., 251 F.3d 262, 267 (1st Cir. 2001). "Thus, so long as a proffered benefit does

not involve employer obligations materially beyond those reflected in *Fort Halifax* . . .

the benefit will not amount to a plan under the ERISA statute." Belanger, 71 F.3d at 455

(footnote omitted).

"There is no authoritative checklist that can be consulted to determine conclusively

if an employer's obligations rise to the level of an ERISA plan." Id. However, "some

factors tend to be more indicative of the existence of a plan than others." Id. In

Nadworny v. Shaw's Supermarkets, Inc., 405 F. Supp. 2d 124 (D. Mass. 2005), the

District Court described those factors that the First Circuit has found to be particularly

relevant as follows:

> A "[p]articularly germane" factor ... is the extent to which the administrator of the benefits must exercise discretion, as opposed to following a mechanical formula, in implementing the plan. *O'Connor*, 251 F.3d at 267. The more that subjective judgments are required of the administrator, the more likely the plan is to fall within the purview of ERISA. *Id.* Another factor, closely related to the question of whether the administrator must exercise discretion, is whether the benefits are disbursed on an ongoing, or one-time, basis. *Belanger*, 71 F.3d at 455. One-time, lump sum payments of benefits frequently are found to be too discrete and temporary to constitute a "plan," and deemed not to be preempted by ERISA. *O'Connor*, 251 F.3d at 268. Third, where the employer's obligation to disburse benefits is triggered by a single event, *Fort Halifax* indicates that preemption is less likely to be appropriate. 482 U.S. at 12, 107 S. Ct. 2211. Also pertinent is whether the employer assumed a long-term obligation to review claims and make payments. *Belanger*, 71 F.3d at 455 ....

405 F. Supp. 2d at 131.  This court finds that the Employment Agreement, when viewed in light of these factors, displays the characteristics of an ERISA-covered plan.

## Relevant Provisions of the Employment Agreement

It is undisputed that the Employment Agreement at issue in the instant case was provided to eleven members of CGI's senior management.  (Pl. Opp. Mem. (Docket No. 97) at 5-6; PF ¶ 66; DR ¶ 66).  Although each Employment Agreement was individualized to reflect the title and role of the particular executive, the terms of the Agreement were otherwise the same for each officer.  (See PF ¶ 69; DR ¶ 69).  Those terms provided in relevant part that the Employment Agreement was to remain in effect for a three-year period, with automatic twelve-month extensions to take effect until the executive resigned or was terminated by the Company.  (EA § 3(a)).  Section 3 of the Agreements defined the events which could terminate the employee's employment and the amounts to be paid under different circumstances.  Thus, the Agreements provided that in the event of the executive's involuntary termination without "Cause," voluntary resignation from the Company for "Good Reason," or voluntary resignation "as a result of the Company's willful and material violation" of certain agreements between the Company and the executive, CGI would be obligated to provide the executive with severance payments, as well as life and health insurance for a period of up to 18 months.  (Id. §§ 3(e); see also PF ¶ 67; DR ¶ 67; Pl. Ex. 43).  Any severance payments thereunder were to be made in a lump sum "within thirty business days after the date of termination" based on a formula set forth in the Agreement.  (EA § 3(e)(ii)).  If, however, the

executive's termination or resignation occurred within three years following a "Change of Control" or after the commencement of a business transaction that resulted in a "Change of Control," the executive was entitled to receive a more generous severance, as well as life and health insurance benefits for up to three years. (Id. § 3(f); Pl. Ex. 43).

All determinations of the amount of severance benefits to be paid pursuant to Section 3 of the Employment Agreement, based on the circumstances of an executive's termination or resignation from employment, were to be made by CGI's Board of Directors or its Compensation Committee,[14] and these entities were obligated to act "in good faith." (EA § 3(j)).[15] Therefore, the Company was responsible for making the determination as to whether the executive was eligible for severance payments and benefits, as well as the extent of any such payments and benefits. For the reasons that follow, this court finds that the discretion afforded to CGI under the Employment Agreement, and the nature and extent of the benefits obligations thereunder, distinguish the Agreement as an ERISA-covered plan.

---

[14] The Employment Agreement defines "Board" as the Board of Directors of CGI and the "Committee" as "the Compensation Committee of the Board of Directors of the Company or such other committee that the Board may appoint to administer the Incentive Plan in accordance with Section 3 of the Incentive Plan." (EA ¶ 8). Since distinctions between the two are generally irrelevant for present purposes, they will be referred to collectively as either the "Board," the "Committee," or CGI.

[15] As detailed further below, these determinations were to be made first under the Incentive Award Agreements but, if no determination had been made under those Agreements, it was to be made under the Employment Agreement. Determinations made under one type of Agreement were conclusive and binding on the other. In any event, the evaluation whether amounts were due were to be made by CGI, and were not merely formulaic calculations.

## **Need for Discretion**

As indicated above, "[t]he extent to which the benefits administrator must exercise discretion in the discharge of his duties is . . . a significant factor in determining a question of ERISA preemption because it is indicative of the complexity of the benefit program." Nadworny, 405 F. Supp. 2d at 136. Where the benefits are based "on a purely mechanical determination of eligibility and, if accepted, require[] no complicated administrative apparatus either to calculate or to distribute the promised benefit[,]" ERISA is unlikely to apply. Belanger, 71 F.3d at 455. On the other hand, where the question whether a payment is due depends on the employer's judgment as to the employee's eligibility for benefits, the "employer, by contrast, needs some ongoing administrative mechanism" for making such determinations. See Simas v. Quaker Fabric Corp. of Fall River, 6 F.3d 849, 853 (1st Cir. 1993).

Here CGI's Board was tasked with determining whether an executive was eligible for benefits, and the extent of any benefits for which the executive might be eligible. To do so, it had to make a decision as to whether, among other things, the executive's termination was for "Cause," whether the executive had resigned "as a result of the Company's willful and material violation" of an agreement between the parties, whether the executive had resigned for "Good Reason," and whether any resignation for "Good Reason" occurred following a "Change of Control." Although the Employment Agreement contains definitions for these terms, "the definitions themselves evidence the amount of discretion the administrator might be required to use." Nadworny, 405 F.

Supp. at 136. For example, but without limitation, in determining whether an executive had resigned for "Good Reason," the Board may have to determine if the executive had suffered "a substantial reduction" of available facilities and perquisites, or if the Company had breached "any material obligation" that it had to the executive, or, as in the instant case, whether changes in an executive's position were "substantial and adverse[.]" (EA § 8). All of these assessments call for judgment well beyond that required for the application of a simple formula.

Similarly, in assessing whether an executive had been terminated for "Cause," the Board could be called upon to determine whether, "in the Committee's good faith judgment," the executive had committed "an act of personal dishonesty . . . intended to result in the Executive's personal enrichment," or had "willfully" engaged in "a material violation" of the Company's rules and policies. (Id.). These and other definitions contained in the Employment Agreement illustrate that "the administration of benefits under the [Agreement] would entail more than mere mechanical calculations[.]" Nadworny, 405 F. Supp. 2d at 137.

The amount of discretion required for CGI to discharge its duties under the Employment Agreement is comparable to cases in which courts have found the existence of an ERISA plan. See Collins v. Ralston Purina Co., 147 F.3d 592, 596 (7th Cir. 1998) (finding that retention agreement requiring employer to make payments if "a manager's job responsibilities were 'substantially reduced,'" created need for administrative scheme under ERISA); Simas, 6 F.3d at 853 (finding that ERISA applied to Massachusetts statute

requiring employer to determine, "as to each employee discharged within two years after [a corporate] takeover," "whether the employee was discharged for cause or [was] other-wise ineligible for unemployment compensation under Massachusetts law"); <u>Bogue v. Ampex Corp.</u>, 976 F.2d 1319, 1323 (9th Cir. 1992) (holding that compensation program covering ten company executives constituted an ERISA plan where, following a change in control, the company "remained obligated to decide whether a complaining employee's job was 'substantially equivalent' to his pre-acquisition job"). Accordingly, this factor strongly suggests the existence of an ERISA-covered plan.

### Triggering Event

In contrast to the statute in <u>Fort Halifax</u>, which called for payments to all eligible employees upon the occurrence of a single event, the Employment Agreement allowed eligible executives to claim benefits throughout an extended period of time. Specifically, the Agreement authorized both CGI and the executive to terminate the executive's term of employment "at any time" and for a variety of reasons, including for Cause, Good Reason and as a result of the Company's violation of certain agreements. (EA §§ 3(b)-(c)). The absence of a single triggering event, combined with the need for case-by-case assessments as to an executive's eligibility for benefits, "presupposes careful claims processing, in other words, an ongoing administrative scheme." <u>Collins</u>, 147 F.3d at 596. <u>See</u> <u>also</u> <u>Simas</u>, 6 F.3d at 853 (holding that ERISA applied where employees could claim benefits during a two-year time period as long as they were discharged without cause).

Thus, this factor also weighs in favor of the Employment Agreement constituting an ERISA plan.

### Disbursement of Benefits and Length of Obligation

As described above, another "very important consideration" in assessing the existence of an ERISA plan "is whether, in light of all the surrounding facts and circumstances, a reasonable employee would perceive an ongoing commitment by the employer to provide employee benefits." Belanger, 71 F.3d at 455. "A court's finding that an employer has an obligation to disburse benefits on a long-term or periodic basis weighs in favor of ERISA preemption, while a finding that a benefit plan consists solely of an obligation to make a single, lump sum payment of benefits weighs against preemption." Nadworny, 405 F. Supp. 2d at 132.

The Employment Agreement at issue here was to remain in effect for a three-year period, with automatic twelve-month extensions to take effect unless the executive resigned or was terminated. (EA § 3(a)). Although the Agreement called for any severance payments to be made in a lump-sum, because there was no single event that would trigger CGI's obligations to all of the executives at once, the Company faced the possibility of having to make payments to various executives at various times and under different circumstances while the Employment Agreement remained in effect. Thus, unlike the statute at issue in Fort Halifax, which required the company "to disburse its lump sum payments once, to all of its employees at the same time[,]" here, CGI "could not satisfy its obligation by cutting a single check and making a 'single set of payments'

-23-

to all of its [top executives] at once." Collins, 147 F.3d at 595. Instead, the individual

Employment Agreements "required the company to budget for the prospect of paying out

disbursements of varying amounts to its [executives] and at varying times." Id. at 595-96.


In addition to severance payments, the Employment Agreement provided for

health and life insurance benefits for a period of at least eighteen months following

termination, in the event that the executive was terminated involuntarily without Cause,

or resigned voluntarily for Good Reason or because of the Company's violation of certain

agreements. The Agreement's allowance for such ongoing benefits also "distinguishes

[this] case from the one-time, routine disbursement facing the Court in *Fort Halifax*" and

warrants the conclusion that ERISA applies. Collins, 147 F.3d at 596. See also O'Neill

v. The New York Times Co., No. Civ. A. 02-11785-PBS, 2003 WL 69569, at *2 (D.

Mass. Jan. 9, 2003) (finding that severance program providing for twelve months of

medical coverage at employer's expense constituted an employee welfare benefit plan

under ERISA).

Ms. McCarthy argues that the parties to the Employment Agreement never

intended that the Agreement be governed by ERISA. In support of her argument, she

points to a choice of law provision contained therein, which provides in relevant part that

the "Agreement shall be governed by, construed, applied and enforced in accordance with

the laws of the Commonwealth of Massachusetts," and further states that "no defense . . .

given or allowed by the laws of any other State or jurisdiction, or arising out of the

enactment, modification or repeal of any law, regulation, ordinance or decree of any foreign jurisdiction, [shall] be interposed in any action hereon."  (Pl. Opp. Mem. (Docket No. 97) at 6 (quoting EA § 18)).  She also emphasizes the fact that the Employment Agreement contains typical contractual language, but is void of any references to ERISA and its procedural and structural requirements.  According to Ms. McCarthy, this contrasts with the numerous references to ERISA and its requirements that are set forth in a Special Executive Separation Plan, which CGI entered into with lower ranking officers of the Company and was drafted by the same outside counsel who drafted the Employment Agreement.  (Id. at 7-8).

This court agrees that if the parties' intent was the controlling factor, Ms. McCarthy has put forth substantial evidence that the parties did not intend to have the Employment Agreements governed by ERISA.  However, as detailed above, "the existence of a plan turns on the nature and extent of [the] employer's benefit obligations." Belanger, 71 F.3d at 454.  See also Wickman v. Nw. Nat'l Ins. Co., 908 F.2d 1077, 1083 (1st Cir. 1990) ("The crucial factor in determining if a 'plan' has been established is whether the [benefits offered] constituted an expressed intention by the employer to provide benefits on a regular and long term basis.").  Thus, the First Circuit has found the employer's expressions of intent persuasive, but only to the extent they are consistent with those obligations.  See Wickman, 908 F.2d at 1083 (finding that employer's distribution of booklet detailing ERISA rights provided "strong evidence that the employer has adopted an ERISA regulated plan" where plan at issue consisted of a

comprehensive insurance program aimed at providing long term benefits).  The First

Circuit has not relied "on an employer's purported intent where the plan document itself

indicates a contrary purpose."  O'Connor, 251 F.3d at 272.  Where, as here, the document

at issue shows that "the time period [for providing benefits] is prolonged, individualized

decisions are required, and at least one of the criteria [used for awarding benefits] is far

from mechanical[,]" ERISA applies and preempts state law.[16]  Simas, 6 F.3d at 854.

For all these reasons, this court concludes that Ms. McCarthy's Employment

Agreement is an ERISA plan.  Therefore, the state law claims against CGI in the

complaint – Count I (breach of contract) and Count III (breach of duty of good faith and

fair dealing) are preempted and will not be discussed further.  See Metro. Life Ins. Co. v.

Taylor, 481 U.S. 58, 62-63, 107 S. Ct. 1542, 1546, 95 L. Ed. 2d 55 (1987) (ERISA

preempts common law contract claims by which beneficiary seeks benefits under ERISA-

covered plan); Hampers v. W.R. Grace & Co., Inc., 202 F.3d 44, 51 (1st Cir. 2000)

("ERISA's preemption clause preclude[s] state claims to enforce rights under an ERISA

---

[16]  This court recognizes that a contrary conclusion was reached in the 2004 unpublished
decision in Harper v. Keyspan N.E., LLC, C.A. No. 03-CV-11962-RGS (D. Mass. Feb. 17,
2004).  Unlike the instant case, Harper involved a change of control agreement, not an employ-
ment agreement applicable to different circumstances throughout its term.  In addition, in Harper,
the issue of ERISA coverage arose in the context of a motion to remand.  Moreover, unlike the
instant case, in Harper there was no dispute as to any event which required the company to
exercise its judgment and determine if the employee was entitled to receive benefits — the dispute
was simply as to the amount due.  Finally, Harper recognized that the change of control
agreement at issue there did "not fall neatly" into contracts which were covered by ERISA or
others which were not, but that the analysis was "a matter of degrees."  Here, this court finds that
the Employment Agreement at issue required CGI to make "ongoing, individualized determina-
tions regarding employee benefits[,]" which typically distinguish ERISA plans from the "'one-
shot, take-it-or-leave-it incentive[s]'" that fall beyond ERISA's reach.

plan or obtain damages for the wrongful withholding of those rights (quotations and citation omitted)). Furthermore, the plaintiff is not entitled to a jury trial on her remaining ERISA claims. See Gammell v. Prudential Ins. Co. of Am., 502 F. Supp. 2d 167, 172 (D. Mass. 2007) (no right to jury trial in action for benefits under ERISA).

### C. Standard of Review of CGI's Decision

The fact that the Employment Agreement is an ERISA plan does not in and of itself end the inquiry as to what standard of review should be employed by this court in assessing CGI's determination that Ms. McCarthy's resignation was not for "Good Reason." For the reasons detailed herein, this court concludes that under both ERISA and common law, this court should employ a deferential standard of review.

### Review Under ERISA Generally

"When an ERISA plan gives the administrator the discretion to determine eligibility for benefits (as in this case), a reviewing court must uphold that decision unless it is 'arbitrary, capricious, or an abuse of discretion.'" Cusson v. Liberty Life Assurance Co. of Boston, 592 F.3d 215, 224(1st Cir. 2010), and cases cited. If, however, there is no such discretionary authority, the review is de novo. Giannone v. Metro. Life Ins. Co., 311 F. Supp. 2d 168, 174 (D. Mass. 2004), and cases cited. In the instant case, Ms. McCarthy contends that CGI was not given the type of discretion under the Employment Agreement that is necessary to invoke this deferential standard. This court disagrees. Where, as here, CGI was granted the "exclusive right to interpret provisions of the

Program and its decisions are conclusive and binding," there is a grant of discretionary authority sufficient to require a deferential standard of review. Id. at 175.

"The provisions of an ERISA-regulated employee benefit plan must be interpreted under principles of federal common law" which "embodies commonsense principles of contract interpretation. Thus, straightforward language in an ERISA-regulated plan should be accorded its plain, ordinary, and natural meaning." Filiatrault v. Comverse Tech., Inc., 275 F.3d 131, 135 (1st Cir. 2001) (internal quotations and citation omitted). Here, the language used in the Employment Agreement makes it clear that the Board had to interpret the provisions of the Agreement, and that its decision was conclusive and binding on the parties. There was no need for the Agreement to use "any magic words such as 'discretion.'" Coleman v. Metro. Life Ins. Co., 919 F. Supp. 573, 580 (D.R.I. 1996) (citation omitted).

## Under the Employment Agreement, CGI's Review was Discretionary

The starting point of the analysis is § 3(m) of the Employment Agreement, which provides as follows:

> The parties agree that <u>any determination made by the Board or, if applicable, the Committee in connection with the Executive's separation from employment regarding the existence of "Cause," "Change of Control," or "Good Reason" for purposes of the Incentive Plan shall be conclusive and binding upon the parties for purposes of this Agreement.</u> The parties further agree that, in the absence of any such determination made by the Board or the Committee for purposes of the Incentive Plan, <u>any determination made by the Board or the Committee regarding the existence of "Cause," "Change of Control," or "Good Reason" for purposes of</u>

> this Agreement, shall be conclusive and binding upon the parties for purposes of the Incentive Plan.

(EA § 3(m) (emphasis added)).  This provision makes it clear that the Board was to make the determination regarding Good Reason, be it made under the Employment Agreement or the Incentive Award Agreement.[17]  Moreover, pursuant to § 3(j) of the Employment Agreement, any such determination had to be made "in good faith."  No other person or entity was vested with the authority or responsibility to make this assessment.

Ms. McCarthy argues that the Board's decision was not "conclusive and binding" because that phrase is used in § 3(m) only to insure that a decision as to Good Reason under either the Employment Agreement or the Incentive Award Agreement would be binding on the other.  While this court agrees that the phrase "conclusive and binding" is only used in that context in § 3(m), a review of the Agreement as a whole leads inescapably to the conclusion that the Board's decision as to Good Reason was to be "conclusive and binding" on the parties for all purposes.

As an initial matter, § 3(m) of the Employment Agreement contemplates that the evaluation of "Good Reason" would be made first under the Incentive Plan (the "Plan"), and that such determination would then "be conclusive and binding upon the parties for purposes of this '[Employment] Agreement.'"  According to the Plan:

---

[17]  Ms. McCarthy recognized that the determinations were co-extensive in her Notice of Good Reason, wherein she demanded payment under the Employment Agreement as well as under the 2006 and 2007 Incentive Award Agreements.

> The Committee shall have the authority to adopt, alter and repeal
> such administrative rules, guidelines and practices governing the
> operation of the Amended Plan as it shall consider advisable from
> time to time, <u>to interpret the provisions of the Amended Plan and any
> Award and to decide all disputes arising in connection with the
> Amended Plan</u>....  Unless altered, suspended or repealed by the
> Board, <u>the Committee's decisions and interpretations shall be final,
> binding and conclusive on all parties concerned, including</u> the
> Company, its stockholders, Affiliated Companies, and <u>Participants</u>.

(Plan at § 3.3 (emphasis added)).[18]  Thus, there is no question that the Committee's

decision made under the Plan was to be "conclusive and binding" on all parties.

Furthermore, according to the Plan, the "<u>Committee shall determine</u> the effect on an

Award of the disability, death, retirement <u>or other termination of employment of a

Participant</u>."  (Plan at § 13.9 (emphasis added)).  The 2006 and 2007 Incentive Award

Agreements contain express definitions of Good Reason, which the Committee would

have to interpret.  (<u>See</u> IAA at § 5.2).  Thus, under the Incentive Plan and Award

Agreements, the Committee had the authority to determine whether Ms. McCarthy's

resignation was for Good Reason, (<u>id.</u>), the Committee's decision was "final, binding and

conclusive on all parties," (Plan at § 3.3), and, once having been made, the decision was

"conclusive and binding on the parties" for purposes of the Employment Agreement.  (EA

§ 3(m)).

   The fact that the Employment Agreement itself does not contain express language

that the Committee's decision was final and binding on all parties does not alter this

---

[18]  It is undisputed that Ms. McCarthy is a "Participant" under the Plan, i.e., the person
who is to receive an award.  (<u>See</u> Plan at § 2).

court's conclusion.  Since the decision of Good Reason was to be made by the Committee in connection with the Incentive Award Agreement, and then incorporated into the Employment Agreement, the Committee's decision retained its conclusive effect when applied to the Employment Agreement.  Moreover, even under the Employment Agreement itself, CGI, through its Board or Committee, was the only party with the authority to assess the sufficiency of a Good Reason claim.  If the determination was made under the Employment Agreement first, it was then to "be conclusive and binding upon the parties for purposes of the Incentive Plan."  (EA § 3(m)).  The Incentive Plan made it clear that "the Committee's decisions and interpretations shall be final, binding and conclusive on all parties concerned[.]"  (Plan at § 3.3).  In short, no matter how the parties twist and turn the relevant contractual provisions, the assessment of Good Reason made by the Committee was to be conclusive and binding on them.

It is well-established that this type of contract language grants the Board "discretionary authority to determine eligibility for benefits or to construe the terms of the plan" so as to require a deferential standard of review.  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 956, 103 L. Ed. 2d 80 (1989).  Thus, the document "need not use any particular language in conferring discretion.  Instead, any language which reasonably shows an intent to confer such power and discretion upon the Plan Administrator or on the fiduciary will be sufficient."  Miller v. Wang Labs., Inc., 998 F. Supp. 78, 79-80 (D. Mass. 1998) (internal citations omitted).  Language such as that used here, where the Committee is delegated the authority to "interpret the provisions

of the Amended Plan and any Award and to decide all disputes arising in connection with the Amended Plan," and where its "decisions and interpretations shall be final, binding and conclusive on all parties concerned," constitutes a grant of discretionary authority. See id. at 80, and cases cited (language such as proof of claims "must be satisfactory to us" or that "[t]he company has the exclusive right to interpret and administer the provisions of each plan, and its decisions are conclusive and binding[.]" confer discretionary authority).

### The Effect of a Conflict of Interest

The plaintiff argues that even if the Employment Agreement granted discretion to CGI, no deference should be awarded the Company's determination because of an inherent conflict of interest. Specifically, Ms. McCarthy objects to the fact that if CGI were to determine that there was Good Reason for her departure, it would have to pay the increased amounts due. According to Ms. McCarthy, this would not only affect CGI's operating expenses, but also "potentially [affect] the incentive compensation of three Mapfre affiliated individuals on the Committee." (Pl. Mem. (Docket No. 56) at 18). Not only does this argument overstate any potential conflict of interest, but the law is clear that the deferential abuse of discretion standard still applies despite the conflict of interest.

Where, as here, an employer would stand to gain if it did not have to pay the increased severance benefits, there is a structural conflict of interest. Fuqua v. Tarmac of Am., Inc., 228 F. Supp. 2d 755, 760 (E.D. Va. 2002). Nevertheless, the scope of this

conflict is unclear.  Ms. McCarthy argues that the Company would stand to lose $100 million if it determined that there was Good Reason for the departure of all the executives.  (See Pl. Mem. (Docket No. 56) at 18-19).  While this may be factually true, each executive seems to have had different job responsibilities and positions.  The merger would have affected each of them differently.  The Employment Agreement is not a change of control agreement, and a change of control alone does not trigger increased benefits.  Thus, while the financial impact of finding Good Reason was highlighted by Katten in its report to the Board, (CGI Ex. 56 at 2), the impact of such a finding vis-à-vis claims by other executives is far from clear.

In any event, the law is clear that even where there is a structural conflict in that the same entity that makes the decision as to eligibility pays the claim, this situation does not negate the abuse of discretion standard.  Rather, it is a fact that must "be weighed as a factor in determining whether there is an abuse of discretion."  Cusson, 592 F.3d at 224 (quoting Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 115, 128 S. Ct. 2343, 2350, 171 L. Ed. 2d 299 (2008)).  While this means that "courts are duty-bound to inquire into what steps a plan administrator has taken to insulate the decisionmaking process against the potentially pernicious effects of structural conflicts[,]" it is not conclusive.  Id. at 224-25 (quotation omitted).  In short, a "conflict of interest does not displace the arbitrary and capricious standard of review; rather, it is a factor that we consider when determining whether the administrator's decision to deny benefits was arbitrary and capricious.  The reviewing court looks to see if there is evidence that the conflict in any way influenced

the plan administrator's decision." Evans v. Unum Provident Corp., 434 F.3d 866, 876 (6th Cir. 2006) (citations omitted). See also Sznewajs v. US Bancorp Am. & Restated Suppl. Benefits Plan, 572 F.3d 727, 733 (9th Cir. 2009).

### Standard of Review of a Top-Hat Plan

Finally, Ms. McCarthy argues that the Board's decision should not be granted any deference because the Employment Agreement is a "top hat plan," that is a plan which is "'unfunded' and 'maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees.'" Alexander v. Brigham & Women's Physicians Org., Inc., 513 F.3d 37, 43 (1st Cir. 2008) (quoting 29 U.S.C. § 1051(2)). Based on Congress' belief that "high-echelon employees, unlike their rank-and-file counterparts, are capable of protecting their own pension interest[,]" top-hat plans are "exempted from several of ERISA's stringen-cies, including rules governing plan participation, vesting, funding, and fiduciary duty. Reporting and disclosure requirements remain applicable." Id. (internal citations omitted). Despite the fact that the Employment Agreement is a top-hat plan, Ms. McCarthy's contention that this court should apply a *de novo* standard of review is without merit.

In Firestone Tire & Rubber Co. v. Bruch, the Supreme Court "held that when an ERISA-regulated plan vests discretion in the plan administrator, the latter's resolution of benefits claims must be reviewed deferentially. Absent such a delegation of discretionary authority, a plan administrator's decisions are to be reviewed de novo." Denmark v.

Liberty Life Assurance Co. of Boston, 566 F.3d 1, 5-6 (1st Cir. 2009) (citing Firestone, 489 U.S. at 111-12, 109 S. Ct. 948).  This decision was premised, in large part, on the Court's analogy of the plan administrator's fiduciary obligations to the law of trusts.  See Firestone, 489 U.S. at 110-15, 109 S. Ct. at 954-57.  Plan administrators of top-hat plans, however, are exempt from the fiduciary duties imposed on ERISA administrators generally.  Consequently, courts differ as to whether the deferential standard of review should apply.

Some courts have applied a deferential "arbitrary and capricious" standard to top-hat plans despite the absence of fiduciary duties.  See Comrie v. IPSCO, Inc., 636 F.3d 839, 841 (7th Cir. 2011).  Other courts have basically applied a deferential standard which is not dissimilar to the standard used in the face of a structural conflict of interest.  Those courts, while granting "some deference" to an administrator's decision and applying an abuse of discretion standard, conduct a further "evaluat[ion] to assure that [the decision] is supported by substantial evidence and resulted from a deliberate, principled reasoning process."  Fuqua v. Tarmac of Am., Inc., 228 F. Supp. 2d 755, 760 (E.D. Va. 2002), and cases cited.  Finally, still other courts have held that since there are no fiduciaries involved, "the analogy to trust law fails, and the [top-hat] plans are more appropriately considered as unilateral contracts, whereby neither party's interpretation is entitled to any more 'deference' than the other party's."  Goldstein v. Johnson & Johnson, 251 F.3d 433, 436 (3d Cir. 2001).  In such cases, however, the courts have recognized that where the plan grants the administrator discretion to interpret its terms,

that provision must be enforced as well.  Id.  Since "[or]dinary contract principles require

that, where one party is granted discretion under the terms of the contract, that discretion

must be exercised in good faith – a requirement that includes the duty to exercise the

discretion reasonably[,]" the court's inquiry is limited to determining "whether the Plan's

decision was reasonable."  Craig v. The Pillsbury Non-Qualified Pension Plan, 458 F.3d

748, 752 (8th Cir. 2006) (internal quotations omitted).  Therefore, the fact that the court

is conducting "a de novo review does not . . . alter [the] analysis as much as it might

appear at first blush."  Id.

The First Circuit has not indicated which standard should be applied to a top-hat

plan.  In this court's view, that issue does not need to be resolved in this case.  While

there may be nuanced differences in the standard of review to be applied if this court

were to view Ms. McCarthy's Employment Agreement as a straightforward ERISA plan

with a structural conflict of interest, or to interpret it under common law contract

principles applicable to discretionary contracts, or to apply a somewhat lesser standard of

deference as other courts have done where a top-hat plan is involved, these differences

will not affect the outcome of the summary judgment motions.  CGI's deference is not

absolute under any applicable standard.  Even under the most deferential of the possible

standards, this court must determine if the decision was reasonable, supported by

substantial evidence and made in good faith.  See Doyle v. Paul Revere Life Ins. Co., 144

F.3d 181, 184 (1st Cir. 1998); Stamp v. Metro. Life Ins. Co., 531 F.3d 84, 87 (1st Cir.

2008).  The burden is on Ms. McCarthy to show that the decision was unreasonable.

Cusson, 592 F.2d at 225.  In light of the evidence Ms. McCarthy has presented

concerning problems with the scope of CGI's investigation into her Good Reason claim,

this court cannot rule as a matter of law that the decision was reasonable and supported

by substantial evidence.

### D  There are Disputed Facts Concerning the Reasonableness of CGI's Decision

In the instant case, disputed facts preclude the entry of summary judgment on the

issue whether the Board's decision was reasonable.[19]  A trial is necessary to determine

whether the Board was presented with misleading, inaccurate and/or incomplete

information so as to render its decision arbitrary and capricious.  As detailed above,

Ms. McCarthy has submitted evidence which, if believed, could establish that Mapfre

controlled the investigation by Katten, and that the investigation was incomplete in that

Katten failed to interview Ms. McCarthy or Mr. Ermilio, and failed to review critical

documents.  The factfinder may also conclude that the problems with the investigation

were exacerbated by Katten incorrectly informing the Board that Ms. McCarthy had

refused to participate in the process, and by Mr. Fels' failure to accurately explain Ms.

---

[19]  Consequently, summary judgment should be denied as to Count II (declaratory judgment) and Count V (recovery of benefits under ERISA).  "Under the civil enforcement provision of ERISA, a plan participant or beneficiary may sue to recover benefits due under the plan, to enforce the participant's rights under the plan, or to clarify rights to future benefits.  29 U.S.C. § 1132(a).  Relief may take the form of accrued benefits due, a declaratory judgment on entitlement to benefits, or an injunction against a plan's administrator's improper refusal to pay benefits."  Ouellette v. Trs. of Plumbers & Pipefitters of Local 4 Pension Fund, 150 F. Supp. 2d 322, 324 (D. Mass. 2001).

McCarthy's job responsibilities to the Board. In addition, there is evidence that minimal, if any, effort was taken to insure that the "pernicious effects of structural conflicts" did not play a role in the Board's decision. Under such circumstances, this court cannot rule as a matter of law that the decision was "supported by substantial evidence and resulted from a deliberate, principled reasoning process." Fuqua, 228 F. Supp. 2d at 760.

Both CGI and Ms. McCarthy argue that the facts about the effect of the merger on Ms. McCarthy's job responsibilities are so clear that they are entitled to judgment as a matter of law. See and compare Noonan v. Staples, Inc., 556 F.3d 20, 34-35 (1st Cir. 2009) (employer's decision to fire employee for cause was not arbitrary, capricious or made in bad faith, therefore summary judgment entered for employer) with Dabertin v. HCR Manor Care, Inc., 373 F.3d 822, 831-32 (7th Cir. 2004) (company's decision that reorganization did not result in a significant reduction in the scope of employee's authority, position, title, functions, duties or responsibilities was arbitrary and capricious; judgment enters for employee following a bench trial). This court disagrees. There are material facts in dispute which preclude a decision on this issue.

The parties engage in a hyper-technical analysis of the definition of Good Reason contained in the Agreements, as well as each other's description of Ms. McCarthy's job responsibilities. Despite the hyperbole, both parties recognize that a critical issue that CGI had to resolve was whether "McCarthy's core duties as Senior Counsel to CGI emanated from the fact that CGI was a publicly traded company," as McCarthy contends (Pl. Mem. (Docket No. 56) at 11 (emphasis added)), or whether, as CGI contends, such

duties comprised "a de minimis aspect of her job." (CGI Opp. Mem. (Docket No. 102) at

3). Similarly, CGI had to determine whether following the merger, Ms. McCarthy's

"place in the corporate hierarchy changed dramatically," (Pl. Mem. at 13), or whether

"[h]ad she stayed, she would have experienced no substantial, adverse changes in the

status or prestige of her responsibilities, title, authority, powers, functions, duties or

reporting requirements taken as a whole." (CGI Opp. Mem. (Docket No. 102) at 12).

Both parties have submitted sworn testimony and exhibits in support of their positions.

The issue cannot be resolved on summary judgment.[20]

CGI argues that Ms. McCarthy is basing her claim on changes at CGI as opposed

to changes she experienced (CGI Opp. (Docket No. 102) at 1). This court disagrees.

Ms. McCarthy is arguing that her job responsibilities changed dramatically after the

merger. As she summarizes the changes in her position:

> The record is clear that CGI's transformation from an independent,
> publicly traded company to a wholly owned subsidiary of a foreign
> corporation resulted in [a substantial and adverse] alteration to Ms
> McCarthy's position as Senior Counsel to CGI and General Counsel
> to its operating subsidiaries: It rendered irrelevant the entire portfolio
> of Ms. McCarthy's work that involved CGI's ongoing compliance
> with the laws applicable to publicly traded companies; it eliminated
> her public profile as a senior executive officer of a publicly traded

---

[20] If there was no question that the procedure followed by CGI was appropriate, and that
the Company was given accurate information, this court would undoubtedly have to defer to
CGI's assessment. A court cannot "substitute its own weighing of the conflicting evidence for
that of the Committee" or "simply reject the Committee's reasonable decision merely because it
[disagrees] with the conclusion." Dabertin, 373 F.3d at 831. Given the dispute about the
propriety of CGI's investigation, however, the fact finder will first have to determine if CGI's
assessment is entitled to any deference at all.

company; and it eliminated her status, title, and responsibility as a
Section 16 Officer.  Ms. McCarthy became one of many lawyers in
Mapfre's constellation of subsidiary in-house counsel.  She no
longer reported to the Chief Legal Officer of the corporate enterprise
or to [the] parent company's President, CEO and Chairman of the
Board.  Rather than belonging to the small group of senior executive
officers who set the strategic direction for the entire corporate
enterprise, Ms. McCarthy became irrelevant to that effort, as it was
now in the hands of Mapfre's Board Committees in Spain.

(Pl.'s Mem. (Docket No. 56) at 2-3).  For its part, CGI argues that "McCarthy's alleged

public company duties were meager, ministerial and not a substantial component of her

job."  (CGI Opp. Mem. (Docket No. 102) at 5).  According to CGI, "Ms. McCarthy

simply pretends away her primary duties as General Counsel to operating subsidiary

insurance companies, including responsibilities for litigation, regulatory matters,

intellectual property, transactional, employment and the myriad other legal issues facing a

$2 billion insurance company."  (Id. at 3).  These factual disputes render summary

judgment for either party inappropriate.

        CGI also contends that Ms. McCarthy is going beyond the specific examples in her

Notice in support of her contention that the merger had a substantial negative impact on

her position.  However, the substance of Ms. McCarthy's claim has remained unchanged.

As the Dabertin court held in language applicable here:

                the defendants put too fine a point on the fact that [plaintiff] did not
                mention a particular loss in her initial application for severance
                benefits.  She had no reason to know that her application for benefits
                would be so hotly contested that she might need to load it with every
                piece of available evidence of job diminution from the get-go.

Dabertin, 373 F.3d at 830. Similarly, this court finds unavailing CGI's complaint that some of the examples of Ms. McCarthy's job responsibilities on which she relies were outside the comparable time frame as set forth in the Employment Agreement. Whether or not each example is persuasive, or even admissible,[21] the fact remains that Ms. McCarthy has put forth evidence that among her "core" responsibilities were the regulatory affairs of CGI as a publicly traded company.

CGI also objects to the fact that Ms. McCarthy allegedly did not give CGI the opportunity to "cure" her objections. CGI seems to contend that Ms. McCarthy should have given her notice before the merger was completed. (See Def. Mem. (Docket No. 64) at 21-22). However, there is no indication that the merger would have been halted if CGI had known about Ms. McCarthy's claim. In fact, as detailed below, there is substantial evidence that CGI did know of potential Good Reason claims by a number of officers and executives. Assuming, arguendo, that under her Agreements Ms. McCarthy should have made her demand before the merger so as to give CGI an opportunity to cure, any such demand would have been futile. See and compare Needham v. Candie's, Inc., No. 01 CIV 7184 LTS FM, 2002 WL 1896892, at *3-4 (S.D.N.Y. Aug. 16, 2002) (resignation for Good Reason premature where parties were discussing different employment options). CGI was not going to halt the merger and it is Ms. McCarthy's contention that once CGI lost its status as a publicly traded corporation, Ms. McCarthy's job was going to be

_____

[21] The admissibility of evidence should be determined at trial.

substantially and adversely affected.  CGI's claim that the plaintiff's Notice was untimely is without merit.

### E.    CGI's Claim of Breach of Fiduciary and Professional Duties

CGI argues that even if Ms. McCarthy had Good Reason to resign from her employment, she should be barred from any recovery because she breached her fiduciary and professional responsibilities to CGI by failing to notify and advise the Company, at any time prior to the merger, that she had a personal financial interest in the closing of the merger as a result of her Employment Agreement, or that under her interpretation of the Good Reason provision, CGI's senior officers could claim a total of $100 million in benefits immediately upon the closing of the merger.  Even assuming, arguendo, that Ms. McCarthy had a duty to disclose such information, this court finds that disputed issues of fact preclude summary judgment for CGI on these claims.

As an initial matter, CGI's arguments regarding Ms. McCarthy's alleged failure to inform and advise the Company are premised upon a mischaracterization of Ms. McCarthy's Good Reason claim.  The plaintiff does not contend, as CGI argues, that a Change of Control of the Company automatically triggered her right, and the rights of other CGI executives, to resign for Good Reason.  Rather, she claims that the particular Change of Control that occurred upon the merger with Mapfre "worked a substantial and adverse change in the nature, status or prestige of the particular positions she held at CGI."  (Pl. Reply Mem. (Docket No. 110) at 6 n.5).  There is no evidence in the record that the merger would similarly affect other executives.  CGI's assertion that Ms.

McCarthy wrongfully concealed her belief that the closing of the merger automatically would trigger a $100 million liability is based on a faulty assumption about the plaintiff's interpretation of the Employment Agreement.

Furthermore, to the extent CGI contends that Ms. McCarthy breached her fiduciary duties by engaging in self-dealing, the plaintiff has presented evidence sufficient to defeat such a claim. In cases involving self-dealing, a corporate officer's disclosure obligations arise from the fact of the officer's "involvement in a self-interested transaction." Boston Children's Heart Found., Inc. v. Nadal-Ginard, 73 F.3d 429, 434 n.5 (1st Cir. 1996). See also Genesis Technical & Fin., Inc., 74 Mass. App. Ct. 203, 210, 905 N.E.2d 569, 575 (2009) (duty to disclose material details of transaction to corporation arises when director or officer "wishes to take advantage of a corporate opportunity or engage in self-dealing"). However, in the instant case, Ms. McCarthy has submitted facts showing that she was not involved in any such transactions. In particular, Ms. McCarthy has presented evidence showing that she had no involvement in CGI's decision to offer Employment Agreements to its key executive officers, did not participate in drafting the substance of the Agreements, which was done by CGI's outside counsel, and did not see a copy of the Agreement until after the Compensation Committee of the Board had approved its key terms. (See Pl. Ex. 7 at 120; CGI Exs. 34 & 37; Pl. Supp. Ex. 128 ¶ 9; Pl. Supp. Exs. 126-27). Similarly, it is undisputed that Ms. McCarthy was not consulted about the advisability of a potential merger with Mapfre, was not invited to attend Board meetings concerning the merger, and did not participate in negotiations

concerning the merger.  (CGI Facts ¶¶ 155-56, 158).  Accordingly, CGI is not entitled to summary judgment on its claim that Ms. McCarthy breached her fiduciary obligations to her client by failing to disclose her interest in CGI's transactions.[22]

CGI's argument that Ms. McCarthy should be estopped from any recovery due to her failure to advise and inform the Company about its potential liability under the Employment Agreements is further undermined by evidence that both CGI and Mapfre had full knowledge and understanding of such liability well before they consummated the merger.  For example, but without limitation, the record reveals that in its January 8, 2008 Proxy Statement to shareholders, CGI specifically disclosed the risk that it might have to pay severance and incentive awards to executives who resigned for Good Reason following the completion of the merger, and it listed the aggregate amount of the payments that it might have to pay to each of its senior executive officers in the event of a termination within three years of the merger.  (Pl. Ex. 1(E) at 39-41).  Additionally, the record contains evidence showing that after receiving information regarding the terms of the Employment Agreements, Mapfre unsuccessfully sought to make CGI obtain new agreements from each of its key executive officers in which the officers would waive the right to claim Good Reason following the merger.  (See Pl. Ex. 7 at 144; Pl. Exs. 47-48). Thus, the evidence presented by Ms. McCarthy shows that CGI and Mapfre chose to

_____

[22]  Ms. McCarthy also has presented evidence, in the form of expert testimony, supporting her position that she acted consistent with her ethical and professional obligations as an attorney. (See Pl. Supp. Ex. 169 ¶ 4; Pl. Supp. Ex. 172 ¶¶ 3-4).

proceed with the merger despite their awareness that CGI could face potentially signifi-

cant liability under the Employment Agreements. If believed, these facts defeat any

suggestion that CGI was unfairly blindsided by Ms. McCarthy's failure to disclose

information or was otherwise harmed by her actions. See Pollock v. Marshall, 391 Mass.

543, 557, 462 N.E.2d 312, 321 (1984) (attorney did not breach any duties to client where

client "was found to have had full knowledge of, understood, and consented to all the

transactions" in which the attorney had an interest).

## IV.  CONCLUSION

For all the reasons detailed herein, this court recommends to the District Judge to

whom this case is assigned that CGI's Motion for Summary Judgment (Docket No. 63) be

ALLOWED as to Counts I and III and otherwise DENIED, and that Ms. McCarthy's

Motion for Summary Judgment (Docket No. 55) be DENIED with respect to all of the

claims against CGI.[23]

----

[23]  The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party
who objects to these proposed findings and recommendations must file a written objection thereto
with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommenda-
tion. The written objections must specifically identify the portion of the proposed findings,
recommendations or report to which objection is made and the basis for such objections. The
parties are further advised that the United States Court of Appeals for this Circuit has repeatedly
indicated that failure to comply with this Rule shall preclude further appellate review. See
Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v.
Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616
F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982);
Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-
54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985). Accord Phinney v. Wentworth Douglas Hosp.,
199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir.
1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).

_____/ s / Judith Gail Dein_____
Judith Gail Dein
U.S. Magistrate Judge