```
                          )
LOUISE M. MCCARTHY,       )
                          )
        Plaintiff,        ) CIVIL ACTION NO. 09-CV-10161-PBS
                          )
     v.                   )
                          )
THE COMMERCE GROUP, INC. and )
MAPFRE, S.A.,             )
                          )
        Defendants.       )
                          )
```

## MEMORANDUM AND ORDER
December 16, 2011

Saris, U.S.D.J.

### I. INTRODUCTION

Plaintiff, Louise M. McCarthy, was formerly the Senior Vice President, Senior Counsel, and Assistant Secretary of defendant, The Commerce Group, Inc. ("CGI"), and General Counsel of several of CGI's subsidiaries. Prior to June 2008, CGI was a publicly-traded Massachusetts-based holding company operating entirely through its insurance subsidiaries. On June 4, 2008, CGI merged with defendant Mapfre, S.A. ("Mapfre") and became a private, wholly-owned subsidiary of a publicly-traded foreign corporation - a Madrid-based global conglomerate of insurance subsidiaries. On June 5, 2008, one day after the closing of the merger, McCarthy submitted a Notice of Intent to Resign for Good Reason pursuant to the terms of her 2007 Employment Agreement and her 2006 and 2007 Incentive Award Agreements. Her "Good Reason"

claim was denied.  As a result, McCarthy claims that CGI's denial

violated the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. §§ 1001, _et seq._, and that Mapfre

intentionally interfered with her rights under the 2007

Employment Agreement.[1]

After a seven day trial, I make the following findings of

fact and conclusions of law, and order that the case be remanded

to the plan administrator because of significant procedural flaws

that rendered the decision to deny Plaintiff benefits under the

top-hat plan unreasonable.


## II. FINDINGS OF FACT

1. **Rising Through the Ranks**

CGI hired McCarthy as Senior Counsel in September 2001.

Prior to her employment at CGI, McCarthy practiced insurance

regulatory law after graduating from University of Maine Law

School in 1992.  She served as Assistant General Counsel of the

Massachusetts Division of Insurance from 1993 to 1995 and then as

---

[1]This action was originally filed by the plaintiff in state
court following the Board's decision to reject her Notice of Good
Reason.  The case was removed to this Court based on the federal
ERISA claims on February 3, 2009.  The state contract claims were
dismissed as preempted and the plaintiff was given leave to file
an amended complaint, which she did on September 1, 2011.  The
Amended Complaint asserts a claim against CGI and Mapfre for
violations of ERISA under 29 U.S.C. § 1132(a)(1)(B) and a second
claim against Mapfre under ERISA 29 U.S.C. § 1140 for intentional
interference with her rights under the Employment Agreement and
Incentive Award Agreements.

in-house corporate counsel at Commercial Union Insurance Company
from 1995 to 2001. McCarthy is a member of the Massachusetts
bar. McCarthy took no classes and had no experience or job
training in SEC or corporate compliance matters. At the time
McCarthy joined CGI in 2001, the Massachusetts-based company was
just beginning to expand as a public company by acquiring
subsidiaries outside New England. As such, her strong background
in insurance regulation was valuable.

During her tenure at CGI, McCarthy steadily rose through the
ranks. In 2003, McCarthy was elected Assistant Vice President of
CGI, making her one of a small group of officers. This position
made her eligible for officer perks such as special compensation
packages, and it also allowed her to build an important
relationship with CGI's Board of Directors. In May 2006,
McCarthy was appointed Vice President and Senior Counsel of CGI.
Three months later, McCarthy was made a Senior Vice President,
Senior Counsel, and Assistant Secretary of CGI. As a result of
her promotion to Senior Vice President at CGI, McCarthy was named
a Section 16 officer, which meant she had a significant policy-
making position within the company and was deemed to have
material inside information at all times according to the
Securities Exchange Act. See 15 U.S.C. § 78p; 17 C.F.R. §
240.16a-1(f). As a Section 16 officer, McCarthy also attended
the Annual Meeting of Shareholders, where she was publicly

introduced as a member of the senior management team. In August 2006, she was appointed Senior Vice President and General Counsel of the insurance subsidiaries, the "Group." The subsidiaries' legal affairs were consolidated under her management. Her positive job evaluations were reflected in the significant salary boost that followed. By the time McCarthy resigned, she was earning a $270,000 base salary and her 2007 Restricted Stock Unit Award amounted to $565,988, grossed up to account for tax and other consequences under the Internal Revenue Code.[2]

In 2006, McCarthy began reporting to two different supervisors in recognition of her dual role. In her capacity as Senior Vice President, Senior Counsel, and Assistant Secretary to the parent company, CGI, McCarthy reported to the General Counsel of CGI, James Ermilio. In her capacity as General Counsel, Senior Vice President, and Assistant Secretary to the subsidiaries, McCarthy reported directly to Gerald Fels, who held the position of CEO to each of CGI's subsidiaries.

2. **Public Company Duties**

In 2006, after Ermilio accepted a more business-oriented function within the company as newly-elected Executive Vice President,[3] McCarthy assumed greater supervision of the day-to-

---

[2]Compensation, however, is not part of her Good Reason claim as it was never in jeopardy after the merger.

[3]As Executive Vice President of the Massachusetts operations, Ermilio supervised all underwriting, premium

4

day legal affairs as the highest-ranking lawyer in CGI with an exclusively legal function.

In fact, McCarthy's new role as Senior Counsel and Senior Vice President to CGI parent corporation carried specific public company responsibilities in addition to her corporate commercial law and insurance regulatory duties such as management of all multi-state insurance regulation matters, litigation, and contract disputes. Ermilio began assigning McCarthy public company-related duties as early as 2003, shortly after Sarbanes-Oxley ("SOX") went into effect. However, McCarthy assumed more responsibility after her promotion. At the time, McCarthy received one formal training on SEC matters from CGI's outside firm, Nutter McClennen & Fish LLP. Nutter was the outside counsel which handled SEC and SOX related matters for CGI.

In-house, McCarthy provided legal services to the audit, corporate compliance and nominating committees; participated in the Massachusetts Executive Committee, Countrywide Executive Committee, the Strategy Committee and the 8-K[4] Disclosure Committee; reviewed SEC filings prepared by the company

---

accounting, and marketing for more than 80% of CGI's holdings. He also supervised outside lobbyists for the corporation.

[4]Form 8-K is the report companies must file with the SEC to announce material corporate events that shareholders should know about.

accounting department, namely 10-Qs, 10-Ks;[5] contributed to the filing of § 302 Certifications by certifying the implementation of internal controls within her department;[6] developed director training programs and related-party transaction policy; and actively participated in the development of insider trading programs and § 16A/Form 3 filings.

McCarthy took particular pride in her title as a Section 16 officer and her membership on the Strategy Committee, which was in charge of establishing enterprise-wide strategy and making material transaction decisions.  It supervised the growth of the company outside Massachusetts by recommending subsidiary acquisitions, hiring new employees, determining the sites of offices around the country, and overseeing the operations of CGI's insurance companies.

As for the other executive committees, McCarthy was responsible for updating the nominating and corporate governance committee charters, and she attended meetings of the nominating, corporate governance, and audit committees as necessary.  For

---

[5]Public companies must file annual reports on Form 10-K and quarterly reports on Form 10-Q with the SEC.

[6]As shown in Joint Exhibit 32, McCarthy certified in a CGI internal document that she "reviewed the quarterly report on Form 10-Q" for accuracy and designed, or caused to be designed, internal controls for disclosure and financial reporting in the legal department.  This internal report, along with similar reports from the other departments, allowed the signing officer, Chief Financial Officer Randall Becker, to file the enterprise-wide § 302 Certification required by the SEC.

example, McCarthy drafted the summary report for the nominating committee meeting held on November 14, 2007. However, she did not attend the four compliance committee meetings between August 2006 and October 2007; a member of her staff attended in her stead. As for the Audit Committee, McCarthy was not a member but she attended part of each meeting to present on the status of significant legal matters. She also kept the Audit Committee charter current. For this, she relied heavily on Todd Peckham, a non-attorney legal analyst on her staff, to monitor SEC rule updates and alert her as necessary.

McCarthy implemented a director training program, continuing education program, and Board of Directors Manual for which she compiled important internal documents and company filings. The director training program was not utilized, however, because there were no new directors during McCarthy's tenure. Additionally, under McCarthy's supervision, Nutter worked with a member of her staff to create a conflict-of-interest policy.

According to McCarthy's supervisor, Ermilio, who had recommended McCarthy for the promotion, it is of "tremendous importance" for in-house counsel to advise the company on SOX matters and "very important" for CGI to implement policies and procedures ensuring SOX compliance. In his view, significant internal and external status and prestige accompanied her role advising committees of the Board of Directors and her title as a

Section 16 officer.[7]  To his knowledge, Ermilio believed McCarthy's position would make it easier to get another job as a general counsel in another outfit.  At the same time, Ermilio noted that such a promotion brought a "mixed blessing" of prestige and responsibility.

McCarthy's performance reviews from 2007 and 2008, however, indicate that her most significant and most time-intensive projects related to her role as General Counsel to the subsidiaries.  For example, in 2007, McCarthy was the lead attorney in the acquisition of State-Wide Insurance Company, and she negotiated the 20-year AAA agreement.  In comparison, Ermilio agreed that public company-related duties were a "relatively small" part of McCarthy's day-to-day tasks.  Instead, CGI routinely retained outside counsel for such matters.  When asked, McCarthy could not estimate the percentage of time she spent on SEC matters.

## 3.    __The Top Hat Agreements__

At the start of CGI's merger discussions with Mapfre and other potential suitors, CGI's independent Board of Directors authorized the company to enter into Employment Agreements with

---

[7]Ermilio based this opinion on his "experience with other attorneys, both in [his] time in private practice and [his] time in-house at another company, at Glaxo, and [his] ongoing discussions with all of [his] contacts and friends then. [He] heard from quite a few of them when [he] became a Section 16 officer, both with congratulations and kind of dire warnings because of the responsibility that comes with it. . . ."

eleven of its key Executive Officers.  McCarthy was included in
this group because of her role as Senior VP and Senior Counsel to
CGI.  The group was comprised of the "Section 16 officers" of
CGI.  The non-Section 16 officers also received Special Officer
Separation Plans with similar benefits.  As for the Section 16-
officer Employment Agreements, they provided a significant
severance payment, as well as life and health insurance benefits,
in the event the executive resigned for "Good Reason."  "Good
Reason" is defined as:

> (i) a substantial and adverse alteration in the nature,
> status, or prestige of the Executive's responsibilities,
> title, authority, powers, functions, duties or reporting
> requirements, taken as a whole, as compared to the
> Officer's responsibilities, title, authority, powers,
> functions, duties or reporting requirements, taken as a
> whole, immediately prior to the Change in Control. .
> .[I]n no event shall 'Good Reason' be deemed to exist
> unless the Executive shall have given the Company written
> notice before the Executive's voluntary resignation and
> not more than three (3) months after the Executive first
> has actual knowledge of the facts and circumstances
> allegedly constituting Good Reason.

It is undisputed that CGI's merger with Mapfre constituted a
"Change in Control."  Thus, under the terms of the Agreement, the
Board of Directors or the Compensation Committee would determine
whether "Good Reason" exists if provided with proper notice by
the claimant.  The Board's decision is "conclusive and binding."
No specific procedures for determining Good Reason claims were
adopted by CGI or Mapfre to guide the decision-makers in reaching
a decision.

Under the Agreement, the Executive could choose the time period that the Board or Compensation Committee would use as a basis of comparison for determining whether her position changed substantially and adversely. The Agreement reads, "[I]n the event of a Proposed Business Combination that results in a Change of Control, the determination of Good Reason shall be made, at the Executive's election, relative to conditions existing immediately prior to the commencement of the Proposed Business Combination."

Notice must be provided within three months from the time the Executive first has "actual knowledge of the facts" supporting the Good Reason claim, according to the agreement. The agreement states, "in no event shall 'Good Reason' be deemed to exist unless the Executive shall have given the Company written notice before the Executive's voluntary resignation and not more than three (3) months after the Executive first has actual knowledge of the facts and circumstances allegedly constituting Good Reason." The company is given the opportunity to "cure" the basis for the executive's Good Reason claim within twenty days after the receipt of the Notice. McCarthy first had "knowledge and awareness" of CGI's possible merger with Mapfre one month earlier, on August 14, 2007. The merger, however, was still in a preliminary stage - there were several regulatory and

antitrust hurdles to overcome before the closing.  These approvals were ultimately achieved in May 2008 after significant financial disclosures and public hearings.

McCarthy first reviewed the draft Employment Agreement as in-house counsel when it was still in development.  She then signed the finalized Employment Agreement on September 7, 2007.

At the time McCarthy signed, the Compensation Committee responsible for determining Good Reason claims was composed of the independent directors of CGI, each with substantial shareholdings of CGI stock.  After the closing of the merger, the former Compensation Committee disbanded so that when McCarthy submitted her Good Reason Notice, the Board of Directors making the decision was then comprised of executives from the acquirer, Mapfre.

In addition, McCarthy also received Incentive Award Agreements, beginning in 2003, which governed her bonus compensation.  Under these agreements, McCarthy could be granted awards each year, payable three years after the grant.  In this action, McCarthy is seeking the amounts allegedly due to her under her 2006 and 2007 Incentive Agreements with CGI.  These Incentive Agreement awards constitute "Accrued Obligations" under McCarthy's Employment Agreement.  Thus, if the Board had found she resigned for Good Reason, McCarthy would be owed the amount due under these agreements in addition to the Employment

Agreement's severance package and health plan.[8]

It is unclear from the terms of the 2007 Employment
Agreement whether the Board of Directors or the newly formed
Compensation Committee constitutes the "plan administrator."  The
Incentive Plan, on the other hand, clearly identifies the
Compensation Committee as "plan administrator."  For purposes of
this opinion, the Court will assume the Compensation Committee,
composed of CGI's new Board members, absent Gerald Fels,
constituted the "plan administrator" for the Employment Agreement
because they alone voted on McCarthy's claim.  The parties do not
debate the point.

## 4.  __Merger with Mapfre__

Andres Jimenez, President and Chief Operating Officer of
Mapfre Internacional, a subsidiary of Mapfre S.A., was primarily
responsible for exploring a possible expansion into the United

---

[8]The terms of the Incentive Compensation Plan mirror that of
the Employment Agreement:

> The Committee shall have the authority to adopt,
> alter and repeal such administrative rules,
> guidelines, and practices governing the operation
> of the Amended Plan as it shall consider advisable
> from time to time, to interpret the provisions of
> the Amended Plan and any Award and to decide all
> disputes arising in connection with the Amended
> Plan . . .
>
> [T]he Committee's decisions and interpretations
> shall be final, binding and conclusive on all
> parties concerned, including the Company, its
> stockholders, Affiliated Companies, and
> Participants.

States and negotiating the agreement with the help of Javier Fernandez-Cid, the then-Director and General Manager of Mapfre Internacional; Esteban Tejera, Chief Legal Officer of Mapfre S.A.; Domingo Sugranyes, CFO of Mapfre; Jose Manuel Gonzales Porro, Secretary General to Mapfre; Claudio Ramos, head of the International Legal Department; and Jaime Tomayo. Mapfre began discussing a possible merger with CGI in summer 2007, and, in August 2007, the CGI Board voted in favor of the merger. By October 2007, the merger agreement was signed. Between August and October, McCarthy populated a virtual data room with internal CGI documents for Mapfre to examine as part of their "due diligence." Among those considered were the Section 16-officer Employment Agreements and Incentive Award Agreements.

During the negotiation process, Mapfre urged Gerald Fels, CEO of CGI, to condition the merger on CGI's Section 16 officers' signing Retention Agreements that waived their rights to assert Good Reason solely due to conditions that existed as a result of the merger. On October 29, 2007, Andres Jimenez called the Retention Agreements a "key part of the transaction" and pressed Fels, in the alternative, for a signed statement which read:

> I would like to express that I have the intention to continue carrying out my executive duties (position) within the Commerce Insurance Group for a reasonable period of time, under terms and conditions mutually acceptable which will be determined before the closing of the merger agreement. Also, I will do my best efforts to obtain from the key management personnel of the company their agreement to continue serving in their respective

13

management positions following the closing of the transaction. The "key management personnel" to whom Jimenez refers are Jim Ermilio and Randall Becker. Mapfre sought to retain CGI management because the foreign acquirer was unfamiliar with the changing Massachusetts auto insurance market and because CGI, as a future subsidiary of Mapfre, faced a possible $100 million payout if each eligible executive filed for Good Reason.[9] No funds were reserved pre- or post-merger for payments that may have become necessary as a result of the existing CGI Employment Agreements or Mapfre's proposed Retention Agreements. Many of Mapfre's key executives were compensated in part by incentive payments based on the performance of Mapfre's subsidiaries.

Fels refused to comply with Jimenez's request because "it would create a personal interest in the transaction," and he feared making the closing contingent on "the consummation of new agreements with individual officers." Nevertheless, Fels emailed Jimenez that same day assuring him, "I want to give you my personal commitment that I plan to see this transaction through to a satisfactory conclusion for both of our enterprises."

---

[9]The company's exposure under the 2007 Employment Agreement for all of the Section 16 officers was about $60 million. That number increased to $100 million if it were to include all of the non-Section 16 officers who were given Separation Agreements with the same Good Reason clause. Becker, CGI's CFO, prepared spreadsheets at Mapfre's request indicating the maximum financial exposure in the event of resignations for Good Reason after a Change in Control.

Two days after the merger agreement was signed in October 2007, Fels voluntarily agreed to waive his rights under the Employment Agreement with respect to Mapfre. By June 4, 2008, the closing date, Fels had reiterated his personal commitment to waive his Good Reason rights under the existing Employment Agreement in favor of a Supplemental Agreement by which critical officers, such as Fels himself, would be eligible for incentive payments based on the company's 2009 financial performance. It was understood that these payments would be capped and would not equal the payout due if each Section 16 officer was found to have had "Good Reason" to resign under the 2007 Employment Agreement. McCarthy was not on the list of "critical officers" prepared by Fels; thus, there were no plans to offer Plaintiff this Supplemental Agreement.[10] Eventually, after the closing, Fels, Becker, and Cathleen Moynihan of the Human Resources Department, signed these Supplemental Agreements.

Aside from these personnel negotiations, Mapfre and CGI

---

[10]Mapfre hoped all of CGI's critical officers would sign the new agreement in part because it planned to create a new position in the CGI executive hierarchy. At this time, Mapfre planned to insert Jaime Tamayo as Chief Operating Officer between the CEO, Fels, and the other senior officers. As a result, the other senior officers would report directly to Tamayo instead of Fels. This reconfiguring of reporting relationships could have constituted Good Reason to resign for many top executives at CGI. Adoption of the new agreements would have eliminated this payout trigger.

needed to obtain shareholder, regulatory, and antitrust approvals
to close on the merger agreement. McCarthy, along with Ermilio
and others at CGI, met with Mapfre executives, including Mapfre's
in-house lawyers Claudio Ramos and Jose Manuel Porro, at least
once in Boston in April 2008 to strategize about obtaining the
regulatory approvals needed. The meeting was contentious;
however, no critical remarks were directed at the plaintiff
specifically. Mapfre and CGI ultimately achieved these approvals
in May 2008 after significant financial disclosures, votes, and
public hearings.

Both McCarthy and Ermilio felt sidelined by the Mapfre
executives during that meeting and subsequently. McCarthy in
particular feared, "these would be the new bosses" and that "they
would be difficult to work for," especially Porro. During those
meetings, McCarthy's supervisor, Ermilio, described the Mapfre
executives' dismissive attitude toward McCarthy by saying, "They
think you're my girlfriend." During a regulatory meeting in
Massachusetts in spring 2008, a friend of hers commented that
McCarthy looked as if she was carrying the briefcases of the
Spanish guys, or words to that effect.

McCarthy first met with an attorney at the end of that
month, on April 30, 2008.

Shortly before CGI and Mapfre closed on the merger, Ermilio
advised Mapfre, in a memorandum, that the new Board "may be

required to act shortly after the closing in connection with claims by officers for severance under the change in control provisions" in the Employment Agreement. Ermilio's memo did not outline a process for considering these claims except to advise the Board to form a Compensation Committee, which would make the Good Reason determinations.

CGI closed on the merger with Mapfre on June 4, 2008. That same day, McCarthy received news of the new make-up of the Board of Directors and subsidiary boards. Since the company was no longer a publicly-traded company constrained by the rules of the SEC requiring a majority of independent directors, Mapfre selected all inside directors. The new Board would be comprised of Mapfre executives and Gerald Fels. The size of the Board was significantly reduced and Andres Jimenez became Chairman of CGI. After the merger, three layers of management stood between McCarthy and the Chief Legal Officer of the enterprise. Ermilio remained McCarthy's direct supervisor; Ermilio was then supervised by Ramos, Director of International Legal Affairs, who, in turn, was supervised by the Director of Legal Affairs worldwide.

**5.    <u>McCarthy's Notice of Intent to Resign</u>**

McCarthy gave written notice on June 5, 2008, the day after the merger took place, of her intention to resign for Good Reason effective as of the close of business on July 7, 2008. In her

Notice, she asserted that as a result of the Change in Control: "the nature, status, and prestige of [her] responsibilities and functions are substantially and adversely altered. The core duties and functions assumed by McCarthy as counsel to a public company no longer exist. The nature and prestige associated with her position have been eliminated." McCarthy further asserted, "her core responsibility as Senior Counsel to CGI . . . was defined by the fact that CGI was a public company." She listed specific ways in which her position had and would change – advising senior management and the CGI Board of Directors on corporate governance issues such as SEC reporting; preparing for and attending meetings of the Nominating and Corporate Governance Committee; advising the Audit Committee and updating its charter; preparing quarterly reports and meeting with external auditors of CGI in compliance with SOX; preparing responses to SEC inquiries; participating in the review of SEC filings; serving as member of the 8-K Committee regarding public disclosures; advising on insider trading. She also emphasized the fact that she would no longer provide legal advice to the strategic decision-makers of the ultimate corporate enterprise (now Mapfre). In her view, while she would still report, post-merger, directly to CGI General Counsel, Ermilio, and CGI CEO, Fels, Ermilio and Fels no longer controlled the strategic direction of the entire organization as CGI became just one of Mapfre's many

subsidiaries.

If McCarthy prevailed on her Good Reason claim, she would have been entitled to $630,221 under her 2006 Incentive Award Agreement; $217,805 under her 2007 Incentive Award Agreement; $3,622,220 under her Employment Agreement (including certain gross-up amounts, plus additional gross-up payments, if any, that may be due for potential excise and other taxes due under the Internal Revenue Code).

When considering her rights under the Employment Agreement, McCarthy never asked Mapfre to better her position within the new conglomerate in any way.

Ermilio, her direct superior and the CGI Executive Vice President and General Counsel, also gave Good Reason Notice one day after McCarthy. The two did not coordinate with respect to their Notices.

## 6.  **Eye-Rolling**

Fels was surprised and upset when McCarthy first delivered her Notice; he believed her claim was "bogus." Fels testified, he "wasn't going to waste . . . 10 million plus dollars basically on claims that were, in my opinion, absolutely bogus." He "simply couldn't justify giving into [these claims] because probably another dozen officers could make the same kind of argument." Granting such claims could set a precedent, "if . . . word got out that I was going to throw around that kind of

money."

Fels contacted Andres Jimenez of Mapfre as well as Mapfre's counsel, Claudio Ramos, for direction on how to proceed after receiving the Notice. In an email from Fels to Jimenez on June 5, 2008, Fels wrote: "I am quite disappointed that this situation occurred at such an early stage. You can also be assured of my full support to get this resolved *on MAPFRE's terms*." Fels followed up the next day with another email to Jimenez:

> I am extremely disappointed by her action as she did not discuss this issue me [sic] at all before she delivered her letter. In any event, I recommend we need to act with resolve in this matter. It goes to say without question with the transaction completed our in house legal capacity can be cut back. I hate to lose her, *but we have to consider the consequences if we give in to her demands*.

Those "consequences" included CGI's potential exposure of over $100 million in severance liability if each of its key executive officers made similar Good Reason claims.

Fels also informed Randall Becker, CGI's Chief Financial Officer, of the Notice on June 5, 2008. Becker noted that when Fels handed him a copy of McCarthy's Notice, Fels rolled his eyes. Becker, likewise, was "shocked" to learn of McCarthy's filing because he had not anticipated her Good Reason claim.

Claudio Ramos made a special visit to Webster, Massachusetts shortly thereafter. While in Boston, Ramos informed McCarthy that the Board would be holding a meeting to consider her claim, and he invited her to attend. No specifics regarding date or

time were discussed. McCarthy asked him, "Do you have everything you need?" to which he replied, "Yes." The two did not review the details of the claims process or the basis for the claim. McCarthy was content that the Board make a determination on the facts laid out in her Notice alone. McCarthy's attorney wrote in a letter to Ramos dated June 16, 2008:

> You have graciously extended an invitation to Ms. McCarthy and me to attend the Board of Directors' meeting. We assume that the purpose of our attendance pertains to the Notice of Intent to Resign for Good Reason submitted by Ms. McCarthy on June 5, 2008. It is our understanding from your conversation with Ms. McCarthy that you have all of the information you need. If that is the case, we are content to stand by the information set forth the letter [sic], and will await CGI's response. If the board wishes to discuss its response to Ms. McCarthy's Notice, it would be helpful to have that in writing in advance, to determine if our presence at the meeting is necessary.

During that same visit, Ramos separately met with James Ermilio. Ramos asked Ermilio to withdraw his Good Reason claim and stay on as Chief Legal Officer. Ermilio was not convinced.

## 7.    The Katten Investigation

Mapfre and CGI retained Katten Muchin Rosenman LLP ("Katten"), a New York-based law firm, on June 12, 2008 to investigate the merits of McCarthy's claim for benefits. The firm was hired to represent the Board of Directors upon the recommendation of Mapfre's legal department. During the period of retention, Katten acted both as investigator and as counsel for Mapfre and CGI, taking direction mainly from Claudio Ramos.

21

Katten had done prior regulatory work on behalf of Mapfre's U.S. subsidiaries. One of the Katten attorneys, Marc Tract, was also a member of the Board of Directors of a Mapfre subsidiary. Tract, a partner specializing in corporate and regulatory insurance law at Katten, became the point-person leading the investigation into Plaintiff's claims.

In the initial conversation on June 12, 2008, Fels informed Tract that two senior legal department employees submitted notices to resign for Good Reason in the days following the merger closing. Fels expressed surprise over McCarthy's Notice because he saw no change in her position post-merger. Both Tract and Fels understood Katten's mission as conducting an examination of the facts underlying McCarthy's claim. Katten believed that it was operating under a strict deadline because, under the terms of the Employment Agreement, the company had only 20 days from the submission of McCarthy's Notice to "cure" the basis of her Good Reason claim. So, Katten began the investigation immediately on June 12th under the direction and management of Claudio Ramos.

To begin, Tract requested a list of documents from Fels and Claudio Ramos.[11]  Later that day, Tract followed up with another email requesting "job descriptions for all relevant individuals."

Tract also assembled a team at Katten comprised of four additional partners and an associate - Merril Mironer, an employment and labor lawyer; Ed Rayner, an employee benefits lawyer; Michael Verde, a commercial litigator; James Tampellini, a commercial litigator; and Hannah Amoah, a Katten associate. The team identified McCarthy's Employment Agreement and Incentive Agreement as "top hat" ERISA plans early in the review.

On June 12, 2008, Ms. Amoah conducted a review of all of CGI's SEC filings since 2000 and found no relevant information that would indicate that either McCarthy or Ermilio worked "exclusively or extensively on securities related matters."

A few days later, on June 18, 2008, Verde and Tampellini visited the Webster office of CGI.  While in Webster, Tampellini and Verde interviewed Fels in person and Randall Becker over the phone while Becker was on vacation.  Fels spoke candidly about

---

[11]Tract requested: (1) Board and/or Compensation Committee package discussing the Employment Agreements/Parachute Agreements; (2) Minutes of each Board and/or Compensation Committee Meeting; (3) the Employee Manual applicable to employees of Commerce, and specifically McCarthy and Ermilio; (4) Award Agreements for McCarthy and Ermilio under non-equity incentive plan; (5) Details of $25,000 lump sum award discussed on page 41 of Commerce proxy statement; (6) Copies of bills from Nutter firm for legal services during 2006-2008; and (7) Total amount of fees paid to Nutter firm for 2006, 2007, and 2008.

McCarthy's Notice; he told them "the claim was bogus." Fels believed her job as General Counsel of the insurance operating subsidiaries was far more prestigious than her role as Senior Counsel within the public company because, as General Counsel, McCarthy was indispensable to the company - she handled all the legal matters for the subsidiaries, including state regulatory issues and contract disputes. Meanwhile, Becker explained to Katten that as CFO he was responsible for all public reporting, cash flow, budgets, retirement plans and the like. In fact, 30-40% of Becker's work dealt with public company responsibilities; he worked closely with the SEC Manager at CGI on those tasks. When asked to comment on McCarthy's Good Reason claim, Becker told Katten that she had exaggerated her public reporting responsibilities. Becker identified himself as the signing officer, not McCarthy, and claimed responsibility for many of the SEC filings listed in her Notice - namely, quarterly reports, 10-Ks, 10-Qs, and 8-Ks. He also informed Katten that Nutter provided most of the legal advice on public company responsibilities and that McCarthy's nominating and corporate governance committee work was minimal.

By this time, Fels had given his personal commitment to Andres Jimenez that he would waive his rights under the Employment Agreement, and Becker had assured Fels he had no intention of submitting a Notice himself.

The Katten team also conducted a comprehensive search of McCarthy's emails since 2001, with the help of CGI's Information Technology department, and all of the documents residing on her hard drive. Katten searched 15,860 emails dating from 2001 using search terms targeted at highlighting any emails related to McCarthy's public company reporting responsibilities and her securities work.

Katten prepared a memorandum for the Board summarizing the results of its search and conclusions based on its interviews. In preparing this memo, Katten elected not to interview either McCarthy or Ermilio, her direct superior, because they had both submitted notices of Good Reason.

On June 18, 2008, Katten submitted the memorandum summing up these findings. It explained the Board's discretionary authority in deciding McCarthy and Ermilio's Good Reason claims; it calculated the payouts that would result from a Good Reason finding; it defined "Good Reason"; it listed Ermilio's and McCarthy's allegations in support of their Good Reason claims; it summarized the factual findings of its investigation; and it noted the possibility of contesting the timeliness of their Notices. The memo also stated that neither executive, Ermilio or McCarthy, had elected a time period to serve as the basis of comparison as is their right under the Employment Agreement; thus, Katten assumed the executives intended the comparison to be

with the conditions existing immediately prior to the Merger on June 4, 2008. At the time the memo was written, McCarthy had not volunteered, nor did CGI/Katten ask McCarthy for a time period to serve as a basis for comparison. McCarthy verbally requested a different time frame from the one Katten assumed on June 25, 2008 when she met with the Board regarding her claim. At that time, she chose the period between her last promotion and the signing of the merger agreement - August 2006 to October 30, 2007 - as the basis for comparison.

In the memo, Katten reported that less than 1/10th of 1% of her emails related to public company matters and that she had no email folders marked "SEC," "NYSE," "SOX," "SARBOX" or "Regulatory." The firm found only 100 emails between 2004 and 2008 relating to CGI's 10-K, 10-Q and 8-K filings, but 50 of them related to the merger with Mapfre.[12] Katten did find documents relating to her participation as a member of the Compliance Committee, but they interpreted this work to be "minimal at best." Katten also reported that there does not appear to have been a "constant flow of communication" between McCarthy and Brian Breeden, the SEC Reporting Manager in the accounting department at CGI. Breeden's primary duties were to keep the

---

[12]It is worth noting, James Ermilio had discouraged members of the 8-K committee, including McCarthy, from emailing each other about 8-K matters because he was concerned about informally characterizing potential material transactions in such a way.

calendar for all SEC filing obligations, obtain the necessary information, and do the initial drafting. He was not, however, a member of the 8-K Disclosure Committee on which McCarthy sat. After reviewing the legal bills provided by CGI's primary outside counsel, Nutter, Katten reported that these bills showed a "vast majority of the work associated with making public filings and other associated 'public company' work was handled by that firm and was not handled by the company internally."

Notably, the memo contained a few inaccuracies. First, at the very beginning of Katten's analysis, the memo reports that McCarthy has "declined the Company's invitation to participate in the meeting, making it difficult to actually explore [her] allegations in further detail." Although McCarthy's initial communications with Claudio Ramos on Jun 16, 2008 were unclear, the subsequent conversations McCarthy's attorney had with Katten attorney Ed Rayner indicate that McCarthy desired to attend the June 20th meeting. Second, Katten wrote, "Gerald Fels also advised that McCarthy had made some effort with human resources to try and have her job description changed, sometime around August of 2007, to reflect more SEC work but the change was never made." However, there is no evidence that such an effort was made. Third, Katten suggests that McCarthy's Good Reason Notice was untimely because she was aware of a potential merger with Mapfre as early as August 2007, yet she submitted her Notice ten

months later.  Indeed, the Employment Agreement requires the Executive to provide written notice within three months after acquiring actual knowledge of the circumstances allegedly constituting Good Reason.  This position, however, does not recognize the many regulatory hurdles that Mapfre and CGI faced through May 2008, before the closing.  Thus, this Court finds McCarthy's notice was timely as it fell within the three months following the final regulatory approval in May.[13]

As for the issue of "status or prestige," Katten researched whether any cases with precedential value existed on the matter and found none.  No further analysis was conducted into McCarthy's alleged diminishment of status or prestige.  And, significantly, Katten's memo did not address this issue.

After its investigation, Katten reached the conclusion: McCarthy "appears to be an insurance regulatory practitioner," not significantly involved with CGI's securities matters.

Katten attorney, Ed Rayner, wrote to McCarthy on June 18 and June 23, inviting McCarthy to "make herself available to answer any questions that may arise" and to "present whatever facts, documents and points she wishes to make to the Board."  He specifically requested her participation because he had

---

[13]Although Katten argued timeliness in its memo to the Committee, the timeliness of McCarthy's claim was not the basis for the Committee's decision.

previously been misinformed that McCarthy had declined the
Board's invitation.

After sending that email, Rayner spoke with McCarthy's
attorney on the phone at which point the dialogue between the
parties began to deteriorate; this deterioration was reflected in
ensuing email correspondence. McCarthy's attorney informed
Rayner in an email dated June 20, 2008 that, in fact, McCarthy
wishes to attend and that there are "stacks and stacks" of
documents Katten could review supporting McCarthy's Good Reason
claim and several people that Katten should interview about
McCarthy's job duties, specifically her direct supervisor,
Ermilio. McCarthy's attorney further wrote:

> You indicated that the Board was interested in
> determining Ms. McCarthy's 'veracity,' since,
> according to a vast but vaguely described email
> search you did not see evidence that she spent much
> time working on matters having to do with CGI's
> status as a public company. Ms. McCarthy's
> 'veracity,' integrity, and utmost good faith has
> NEVER been questioned before, and this, in and of
> itself, indicates a diminution in her status at
> CGI.

McCarthy's attorney attached to her email a copy of CGI's
Corporate Governance Guidelines manual as one piece of evidence
regarding McCarthy's public company responsibilities. Later that
day, Rayner emailed his colleague, Verde,

> This manual seems to be pretty pro forma and it is
> very unlikely she drafted this from scratch
> (especially as she had zero background in corporate
> or securities law). Marc, any idea where we may be

able to find a model for this sort of manual to
show that McCarthy just did some minor tweaks (like
change the title) to a well-recognized set of model
rules to adopt this for Commerce?  This would make
her and her lawyer look, in legal terms, stupid.

Also on June 20, 2008, Claudio Ramos of Mapfre wrote to Marc

Tract at Katten,

We have reviewed all the documents available in the SEC's
Website regarding Commerce activity from 1996 up to now
. . . the only operations [Ermilio and/or McCarthy] have
carried out are issuance of debt in 2003, split of shares
in 2006, modification of the articles of incorporation .
. . Therefore, there is not only a question of quantity
but also a qualitative one. Could it help?

To which Tract responded, "This is helpful, and tends to show

that both Ermilio and McCarthy can thank Mapfre for giving them

the SEC training they now claim they have."

## 8.    **The Committee Meetings**

The first meeting between the plaintiff and the Board was

scheduled for June 20, 2008, after the confusion as to whether

McCarthy desired to attend at all.  Due to a family emergency,

McCarthy could not attend the meeting.  As a result, the Board

rescheduled her appearance for June 25, several days later.

However, the Board continued to meet on the 20th for 45 minutes

to discuss the claim.  Claudio Ramos, the CGI Board members, and

representatives from Katten were present at the meeting.  First,

the group formed an Executive and Compensation Committee to make

the Good Reason determination.  The committee consisted of Andres

Jimenez, Javier Fernandez-Cid, Domingo Sugranyes, and Esteban

Tejera.  Only these four executives, a subset of CGI's Board of Directors, would later deliberate and vote on whether Ermilio or McCarthy resigned for Good Reason.

The Compensation Committee then reviewed Katten's memo section by section, heard from Fels regarding CGI's operations, and voted to deny Jim Ermilio's Good Reason claim.  Only a few Compensation Committee members read the documents sent by Katten in preparation for the meeting.  For example, prior to the meeting, Andres Jimenez, Chairman of the CGI Board, did not review any of the materials sent by Katten, which included Ermilio's and McCarthy's Notices, the 2007 Incentive Award Agreement, a spreadsheet calculating Officer Incentive Awards, the 2007 Employment Agreement, Mapfre's proposed Retention Agreement, a press release on the merger signing, and correspondence from McCarthy's counsel and Jim Ermilio individually.

Fels made a presentation to the Compensation Committee on McCarthy's various duties within CGI. He stated that "McCarthy was hired because of her background as Assistant General Counsel with the Massachusetts Division of Insurance.  Ms. McCarthy was the Company's liaison to insurance regulators throughout the country. She had no responsibilities specifically related to the Company as a publicly traded company."  However, this key representation to the board is inaccurate.  Both McCarthy and her

supervisor, Ermilio, have provided evidence on McCarthy's responsibilities with respect to the public company-related matters; for example, McCarthy sat on the 8-K and Strategy Committees and reviewed SEC filings.

In reaching a decision, the Compensation Committee members relied on Katten's memo and Fels's presentation. Esteban Tejera stated that the Katten memo answered all of his questions before the June 20th meeting. And Jimenez stated, "[W]e didn't consider good reason . . . after the study, we considered that there were [sic] no reason." The Compensation Committee rejected McCarthy's claim upon "the advice we received from the lawyers." Additionally, Jimenez called Fels, "the most qualified person to give an opinion about the job of his colleagues." None of the Compensation Committee members sought to interview Ermilio about McCarthy's role in the company because Ermilio had submitted a Good Reason Notice himself.

The Compensation Committee members did not fully understand McCarthy's duties and reporting relationships. Jimenez thought McCarthy's position was "Assistant General Counsel" under Ermilio. To that point, he stated, "I didn't know and I don't know exactly [McCarthy's] functions." Furthermore, Fernandez-Cid admitted that he did not understand the functioning of CGI's nominating and corporate governance committee, audit committee,

8-K committee, or Section 16 officer designation when he was making his decision.

The meeting ended after a brief discussion regarding the language in the Good Reason clause of the Employment Agreement. Specifically, those in attendance discussed the significance of the words "taken as a whole" and the meaning of "status and prestige."  As for the former, Tract informed the Compensation Committee that the Good Reason provision required a showing of a "substantial and adverse alteration" in each and every one of the listed factors - responsibilities, title, authority, powers, functions, duties, and reporting requirements - "taken as a whole."  According to Tract, "even if any one factor was in fact present, the Board must take the facts 'as a whole' to see if Good Reason exists with respect to all factors, taken as a whole."  Regarding the latter issue, the Compensation Committee quickly dispensed with McCarthy's status and prestige claim by concluding no real diminution of "status or prestige" existed because now CGI was part of a growing global corporation and public company.  Notably, in forming an opinion, the Compensation Committee largely did not rely on the timing of McCarthy's Notice,[14] Katten's contention that McCarthy had declined an

_____

[14]Fernandez-Cid testified that he did not take into account the timing of McCarthy's Notice in analyzing her Good Reason claim while Jimenez could not remember whether he considered it at all.

33

invitation to meet with the CGI Board, or a possible attempt by McCarthy to have her job description altered to include more SEC responsibilities.[15]

On June 23, 2008, two days before the rescheduled board meeting, Rayner emailed plaintiff's attorney with a summary of Katten's findings so that McCarthy could present evidence and respond with particularity. He summarized Katten's findings as follows:

> The Board has tried to verify Ms. McCarthy's claims by reviewing its records. A review of over 15,000 emails sent and received by Ms. McCarthy revealed less than 200 that had any relevance to SEC regulations, SOX compliance, or any other issues related to CGI's status as a public company. A review of documents authored by Ms. McCarthy found on CGI's server showed a handful having any relevance to these areas. In addition, the understanding of senior executives of the company is that Ms. McCarthy's role and area of expertise are almost exclusively in the area of insurance regulation.

Katten did not inform the plaintiff that the Board had already met and rejected her claim regarding status and presige.

To prepare for the meeting, McCarthy gathered materials relating to her role as counsel to a publicly traded company. She provided the Compensation Committee with only six documents. McCarthy pulled her own job description, which she drafted in

---

[15]It has since been determined that there is no evidence corroborating Gerald Fels's claim (included in the Katten memo) that "McCarthy had made some effort with human resources to try and have her job description changed, sometime around August of 2007, to reflect more SEC work but the change was never made."

December 2006 and Ermilio reviewed in 2007. The description for

her role as Senior Vice President and General Counsel read:

> Plan, supervise, and direct all aspects of the legal
> function of the corporation on an enterprise-wide
> basis, with overall responsibility for the legal
> affairs of the operating companies and secondary
> responsibility for the legal affairs of the holding
> company parent. Responsible for providing legal
> advice, counsel, and direction to senior management and
> the Board of Directors on all legal matters of the
> corporation, including corporate law and governance,
> contracts, compliance, and regulatory issues. Actively
> participate as a member of the senior management team
> in strategic business planning and development of
> corporate strategy.[16]

McCarthy also compiled organizational charts for CGI showing her

position as second in command of the legal department in the

parent company's hierarchy and at the top of the legal

department's hierarchy of the subsidiaries. Additionally, she

provided the Corporate Governance Guidelines, Board committee

charters for the Audit and Compensation Committees, a copy of a §

302 certification, and an excerpt of CGI's Annual Report, listing

---

[16]There were several job descriptions drafted for McCarthy's
position between 2006 and 2008. The Katten investigatory team
had reviewed a different one drafted on September 13, 2007 before
the merger agreement was signed with Mapfre but after McCarthy's
Employment Agreement became effective on the 7th of that month.
This description was incorrect as it excluded McCarthy's duties
as counsel to the holding company parent. McCarthy did not know
who produced such a description; she had never seen it before
discovery in this case; and she was not aware that the latter job
description was considered by Katten. It is unclear whether
either description qualifies as "official." There is no
persuasive evidence that McCarthy attempted to have her job
description changed in fall 2007 to include greater SEC
responsibilities as Katten suggested in its memo.

her as a prominent executive.  Because McCarthy emailed these documents on the morning of the meeting, the Compensation Committee did not review them before McCarthy's presentation.

In attendance at the June 25, 2008 telephonic meeting were: (1) four Katten attorneys - Edward Rayner, Marc Tract, Michael Verde, and Merril Mironer, (2) Spanish counsel Claudio Ramos, (3) Gerald Fels, and (4) all of the Compensation Committee members – Andres Jimenez, Javier Fernandez-Cid, Domingo Sugranyes, Esteban Tejera.

The conference call meeting totaled about 50 minutes. During that time, both McCarthy and her lawyer made presentations.  First, McCarthy's attorney explained her interpretation of the Good Reason standard and requested that the Compensation Committee keep an open mind.  Then, McCarthy spent almost 45 minutes explaining to the Compensation Committee, (1) the timing of her Good Reason Notice, (2) the time period she elected to use to measure the change in her role pre- and post-merger, and (3) the basis of her Good Reason claim.

McCarthy chose to submit her Notice on June 5, 2008 because she feared that, as in-house counsel, she may have been asked to weigh in on the merits of her colleagues' Good Reason Notices should others submit.  She had reason to believe through office gossip that several of her co-workers were also considering their rights under the Employment Agreement.  McCarthy intentionally

waited to submit her Notice until after the merger closed to ensure that CGI and Mapfre cleared the regulatory and antitrust hurdles.  These approvals were ultimately achieved in May 2008 after significant financial disclosure and public hearings.

Next, McCarthy told the Compensation Committee that she was electing the time period running from August 2006, when she was last promoted, to October 30, 2007, when the merger agreement was signed, as a baseline by which the Compensation Committee would measure the change in her position.

The plaintiff then explained what she felt was a diminishment in scope of authority, status, and prestige. Specifically, she mentioned the elimination of her corporate governance duties and the lack of access to the ultimate decision-makers for the company - now Mapfre executives.  In sum, McCarthy reiterated the claims expressed in her Notice.  Little, if any, new information was provided.  Lastly, she informed the Board of her unsatisfying interactions with Mapfre executives, especially Mr. Porro, leading up to the closing date.  The Board did not ask any questions or otherwise interrupt McCarthy during her presentation.

Once McCarthy and her attorney left the conference call, Fels informed the Compensation Committee that McCarthy exaggerated her role in public company matters.  He reiterated his position (which was incorrect) that McCarthy had no

responsibilities specifically related to CGI's status as a
publicly traded company, and he opined that McCarthy had no
factual basis for claiming she had Good Reason to resign.
Tejera, of the Compensation Committee, understood this statement
to mean, "even if she had several tasks related to [public
company work], they were not so important to constitute important
[sic] part of her job."

At this time, Fels was still negotiating with these Mapfre
executives regarding his own retention and rights under the 2007
Employment Agreement. The precise dollar-amount Fels would
receive had not been settled yet.

Immediately thereafter, the Compensation Committee voted to
reject McCarthy's claim.[17] Fels did not vote as he did not sit
on the newly formed Mapfre Compensation Committee. Instead,
Jimenez, Fernandez-Cid, Sugranyes, and Tejera voted to deny. The
conference call lasted only five minutes after the completion of
Plaintiff's presentation. Tejera explained the brevity of this
deliberation by stating, "We didn't need a long time to discuss"
because "we ha[dn't] had time to change anything at Commerce, so
we can't understand and we can't support this kind of complaint,

---

[17]Joint Exhibit 98 lists the documents stipulated to, by both
parties, as part of the record assembled by CGI's Board of
Directors and Katten in connection with the Committee's
consideration of McCarthy's Good Reason claim.

we ha[dn't] taken [sic] any decision relating to the job position of Ms. McCarthy."

On July 3, 2008 Fels sent McCarthy a letter notifying her that the Good Reason claim had been denied by the committee. The denial letter read, "After full consideration, the Board and the Executive and Compensation Committee have determined that there is no 'Good Reason' as that term is defined in both your Employment Agreement and any Incentive Award Agreement for your resignation."  The letter gave no reasons for the denial.

In reply, McCarthy's attorney inquired into Plaintiff's appeal rights and requested all the information upon which the Compensation Committee relied in making their decision as well as a copy of the minutes of the June 25, 2008 meeting.  McCarthy never received a response.

After McCarthy's claim was denied, Fels attempted to reach an alternate resolution with McCarthy in which she would continue her work at CGI.  McCarthy refused because it was impossible to cure the diminution she felt in "status and prestige" as a result of her personal interactions with Mapfre executives and CGI's new position as a privately-owned subsidiary.


## III. DISCUSSION

### 1. <u>Standard of Review</u>

The Supreme Court has held that a "denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de*

*novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989). "When an ERISA plan gives the administrator the discretion to determine eligibility for benefits, a reviewing court must uphold that decision unless it is 'arbitrary, capricious, or an abuse of discretion.'" <u>Cusson v. Liberty Life Assurance Co. of Boston</u>, 592 F.3d 215, 224 (1st Cir. 2010). This standard applies "regardless of whether the plan at issue is funded or unfunded and regardless of whether the administrator or fiduciary is operating under a possible or actual conflict of interest." <u>Firestone</u>, 489 U.S. at 115.

The 2007 Employment Agreement is a "top hat plan" because the severance package was offered to only a "select group," eleven executives, and the benefits would have been payable out of the employer's general assets; the funds were not segregated. A "top hat plan" is a plan which is "'unfunded' and 'maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees.'" <u>Alexander v. Brigham & Women's Physicians Org., Inc.</u>, 513 F.3d 37, 43 (1st Cir. 2008)(quoting 29 U.S.C. § 1051(2)). Congress created this classification with the understanding that "high-echelon employees, unlike their rank-

and-file counterparts, are capable of protecting their own pension interests." Id. As a result, "Congress relaxed some of ERISA's prophylactic obligations" for top hat plans, including rules governing fiduciary duty. Id.

There is a split among the circuit courts regarding whether a *de novo* or arbitrary and capricious standard of review applies to top hat plans generally. Compare Craig v. The Pillsbury Non-Qualified Pension Plan, 458 F.3d 748, 752 (8th Cir. 2006)(applying de novo standard); Goldstein v. Johnson & Johnson, 251 F.3d 433, 443 (3d Cir. 2001)(same); with Comrie v. IPSCO, Inc., 636 F.3d 839, 842 (7th Cir. 2011)(applying deferential standard); Sznewajs v. U.S. Bancorp Amended and Restated Supplemental Benefits Plan, 572 F.3d 727, 733 (9th Cir. 2009)(same); Olander v. Bucyrus-Erie Co., 187 F.3d 599, 607 (7th Cir. 1999)(same). The First Circuit has not taken a position.

Here the CGI Employment Agreement provided: "[A]ny determination made by the Board . . . shall be conclusive and binding upon the parties for the purposes of [the Employment Agreement] . . . [and] the Incentive Plan." Where a plan contractually grants the administrator discretion, under ordinary contract principles, the discretion must be exercised reasonably and in good faith. See Benham v. Lenox Sav. Bank, 26 F. Supp. 2d 231, 238 (D. Mass. 1998)(stating "top hat plans are unilateral contracts, and thus, are governed by contract principles"). In

41

the circumstances of this case, because of the terms of the contract, the standard of review is deferential so long as the plan administrator acted reasonably and in good faith. As such, the debate over the standard of review is much ado about not much. See <u>Craig</u>, 458 F.3d at 752 ("The fact that we conduct a de novo review does not . . . alter our analysis as much as it might appear at first blush.").

Under a deferential standard, procedural irregularities constitute an abuse of discretion when they are "serious," have a "connection to the substantive decision reached, and call into question the integrity of the benefits-denial decision itself." <u>Bard v. Boston Shipping Ass'n</u>, 471 F.3d 229, 244 (1st Cir. 2006)(finding prejudice toward the participant because of the administrator's procedural failures - failure to inform participant what he needed to show for disability eligibility, failure to provide for appeal before entity independent from administrator, and failure to consult medical expert); <u>see also</u> <u>Booton v. Lockheed Med. Ben. Plan,</u> 110 F.3d 1461, 1464 (9th Cir. 1997)(stating that "to deny [a] claim without explanation and without obtaining relevant information is an abuse of discretion"); <u>Blau v. Del Monte Corp.</u>, 748 F.2d 1348, 1353-54 (9th Cir. 1984)(finding that the defendants' failure to comply with "virtually every applicable mandate of ERISA" was

"objectionable"; the defendants did not provide a copy of the relevant plan provisions or any reasonable claims procedure).

**2. Procedural Requirements Governing Top Hat Plans**

Plaintiff argues that the Compensation Committee violated ERISA's procedural mandates when considering her claim for benefits because it did not properly follow the statutory notice provisions and full and fair review requirements.

Section 503 of ERISA provides that every employee benefit plan shall:

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133. Section 503 falls under the administration and enforcement part of ERISA, which, like the part related to reporting and disclosure, contains no exception for top hat plans. In contrast, top hat plans are explicitly exempted from the statutory parts related to participation and vesting, funding, and fiduciary responsibility. See 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1). At the beginning of each of those parts, there is a section entitled "Coverage," which exempts plans that are "unfunded and . . . maintained by an employer primarily for

the purpose of providing deferred compensation for a select group of management or highly compensated employees," otherwise known as top hat plans. Id.

Top hat plans are not excused from ERISA's civil enforcement provisions, including § 503. See Hampers v. W.R. Grace & Co., Inc., 202 F.3d 44, 47 n.3 (1st Cir. 2000); O'Leary v. Provident Life & Accident Ins. Co., 456 F. Supp. 2d 285, 289 n.3 (D. Mass. 2006)("[W]hile a 'top hat' plan is exempt from certain ERISA requirements, it is not exempt from ERISA's reporting, disclosure, administration, or enforcement provisions."); In re New England Mut. Life Ins. Co. Sales Practices Litig., 324 F. Supp. 2d 288, 309 (D. Mass. 2004)(stating 'top hat' plans are subject to ERISA's criminal and civil enforcement provisions); see also Paneccasio v. Unisource Worldwide, Inc., 532 F.3d 101, 108 (2d Cir. 2008)("Top hat plans . . . are exempt from many provisions of ERISA, including the participation and vesting, funding, and fiduciary responsibility requirements . . . but like qualified plans, they are subject to disclosure requirements, to civil enforcement, and to the duty to have a claims procedure." (quoting Eastman Kodak Co. v. STWB, Inc., 452 F.3d 215, 217 (2d Cir. 2006)(internal quotation marks omitted))).

The Secretary of Labor has promulgated regulations which describe the requirements of § 503 in more detail. See 29 C.F.R. § 2560.503-1. The claims procedure regulations require employee

44

benefit plans to "establish and maintain reasonable procedures governing the filing of benefit claims, notification of benefit determinations, and appeal of adverse benefit determinations." § 2560.503-1(b). If a plan administrator makes an adverse benefit determination, the regulations require that the administrator give notice of the determination. § 2560.503-1(g). The notice must set forth:

(i) The specific reason or reasons for the adverse determination;

(ii) Reference to the specific plan provisions on which the determination is based;

(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and

(iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review.

Id.

Along with proper notice, the regulations also require that these employee benefit plans shall "establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a full and fair review of the claim and the adverse benefit determination." § 2560.503-1(h)(1). "Full and fair review" of a claim and an adverse benefit determination requires that

claimants be provided:

    (i) At least 60 days following receipt of a notification of
    an adverse benefit determination within which to appeal the
    determination;

    (ii) The opportunity to submit written comments, documents,
    records, and other information relating to the claim for
    benefits;

    (iii) Reasonable access to, and copies of, all documents,
    records, and other information relevant to the claimant's
    claim for benefits. Whether a document, record, or other
    information is relevant to a claim for benefits shall be
    determined by reference to paragraph (m)(8) of this section;
    and

    (iv) A review that takes into account all comments,
    documents, records, and other information submitted by the
    claimant relating to the claim, without regard to whether
    such information was submitted or considered in the initial
    benefit determination.

§ 2560.503-1(h)(2)(i-iv).

    In sum, the ERISA regulations afford beneficiaries, the

right to two procedural protections - (1) proper notice and (2) a

full and fair review of a denial.  The statute's "claims

procedure" regulations provide detailed directives on these two

points.

    The claims procedure regulations outlined above generally

apply to "every employee benefit plan" covered by ERISA, except

those plans specifically exempted by section 4(b). §

2560.503-1(a). Top hat plans are not among the exempted plans.

See 29 U.S.C. § 1003(b).  A FAQ on the Department of Labor's

website confirms the applicability of its claims procedure

regulations to top hat plans when it states,

> The [claims] regulation establishes requirements for all
> employee benefit plans that are covered under Part 5 of
> ERISA, which would include top hat plans. Certain top hat
> plans are specifically excluded from parts of ERISA . .
> . but that exclusion does not apply to section 503, under
> which the regulation was promulgated.

U.S. Dep't of Labor, Employee Benefits Security Administration, Frequently Asked Questions About the Benefit Claims Procedure Regulation, FAQ A-12, http://www.dol.gov/ebsa/faqs/faq_claims_proc_reg.html (last visited Dec. 12, 2011); see also Maynard v. Merrill Lynch & Co., Inc., No. 8:07-cv-1149-T-23MSS, 2008 WL 4790670, at *9 n.126 (M.D. Fla. Oct. 28, 2008)(quoting Department of Labor's FAQ to support statement that claims procedures apply to top hat plans).

Defendants argue that the Board was not obligated to undertake a full and fair review of McCarthy's claim. In their view, the plain language of § 503 demonstrates that Congress intended to exempt top hat plans from the specific statutory "full and fair review" requirements. Section 503 requires an ERISA plan to "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review *by the appropriate named fiduciary* of the decision denying the claim." 29 U.S.C. § 1133(2)(emphasis added). Because top hat plans are exempt from the fiduciary responsibilities of ERISA, § 1101(a)(1), defendants argue that the "appropriate named

fiduciary" language in the full and fair review provision
effectively exempts top hat plans.

This Court is aware of no federal case which has decided
whether the fiduciary reference in § 1133(2) excuses top hat
plans from compliance with full and fair review. The Third
Circuit has raised the issue, noting:

> Title 29 U.S.C. § 1133(2) is among those enforcement
> provisions of ERISA from which top hat plans have not been
> explicitly exempted. However, by its terms, § 1133(2)
> obligates only "named fiduciaries" – which are not required
> for top hat plans - to conduct a "full and fair review" of a
> benefits denial. We need not decide today whether § 1133(2)
> applies to the administrators of top hat plans per se, or
> whether a "full and fair review" as defined by § 1133(2) is
> itself a component of good-faith plan administration. . . .

Goldstein v. Johnson & Johnson, 251 F.3d 433, 446 n.9 (3rd Cir.
2001). District courts have applied a full and fair review
procedural analysis to top hat plans, but have done so without
addressing the "appropriate named fiduciary" language of §
1133(2). See Fishman v. Zurich Am. Ins. Co., 539 F. Supp. 2d
1036, 1047 (N.D. Ill. 2008); Berg v. BNS Fin. Corp., No. 04 C
7922, 2006 WL 273541, at *10 (N.D. Ill. Feb. 2, 2006); Parker v.
Union Planters Corp., 203 F. Supp. 2d 888, 896 (W.D. Tenn. 2002);
Bigda v. Fischbach Corp., 898 F. Supp. 1004, 1015 (S.D.N.Y.
1995)("It would be illogical for top hat plans to be subject to
some of the administration and enforcement provisions of ERISA
and not to others.").

Based on the regulations and caselaw, this Court concludes that top hat plans are subject to the full and fair review with one caveat – the full and fair review need not be undertaken by a "fiduciary" as there is no fiduciary relationship between administrator and beneficiary in top hat plans. Indeed, the "full and fair review" provision of ERISA is "itself a component of good-faith plan administration." Goldstein, 251 F.3d at 447 n.9.

## 3. Procedural Flaws

In this case, the Compensation Committee failed to satisfy procedural requirements outlined in the regulations for § 503.[18] To begin, the notice of denial of McCarthy's claim did not constitute "adequate notice" under ERISA. See 29 U.S.C. § 1133(1). An ERISA plan administrator must give "specific reasons" for denial of claims for benefits, but it need not provide the

---

[18]Notably, CGI's Special Officer Separation Plan, offered at the same time as the Employment Agreement at issue in this case but to the non-§ 16 officers at CGI, identifies itself as a "top hat" plan and provides for an ERISA-compliant procedural process. It states:

Claims Procedure: Any denial by the Committee of a written claim for benefits under the Plan by a Participant or beneficiary shall be stated in writing by the Committee and delivered as the case may be. Such written statement shall set forth the grounds for the denial in language calculated to be understood without the aid of legal or actuarial counsel. If requested in writing within 60 days of the date of such written statement, the Committee shall afford a reasonable opportunity to any Participant or beneficiary whose claim for benefits has been denied for a review of the decision denying the claim.

"reasoning behind reasons" or "interpretive process that
generated reason for denial." Gallo v. Amoco Corp., 102 F.3d 918,
922-23 (7th Cir. 1996). CGI's Notice of Denial even fails this
low bar. It contained no specific reasons for the denial of
McCarthy's claim, no indication of what materials McCarthy could
provide in order to perfect her claim before a second review, and
no notification of McCarthy's right to bring a civil action
should her claim be denied a second time. See 29 C.F.R. §
2560.503-1(g)(1)(i), (iii), (iv).

Defendants argue that this defect did not prejudice
plaintiff because the email from Katten attorney, Edward Rayner,
to McCarthy's attorney on June 23, 2008, before the meeting at
which the Committee considered McCarthy's claim, adequately
notified McCarthy's attorney that the Committee would consider
the Corporate Governance Policy Plaintiff drafted, the
unfavorable results of a search through McCarthy's emails and
documents for SEC-related matters, and the interviews of "senior
executives" who claim McCarthy's role involves insurance
regulatory matters almost exclusively. Although this email gave
McCarthy a helpful "heads up" before the Committee's initial
review of her claim, this information does not substitute for a
letter including specific reasons for the denial of her claim.
In particular, this email did not notify McCarthy of key facts
reported by Fels and Katten that she would have wanted to dispute

head-on.  For example, McCarthy would have wanted to refute

Fels's statement to the Committee that she had "no" public

company responsibilities; explain her role on the 8-K Committee;

dispute the standard and rationale Katten applied to the "status

or prestige" claim; and clarify that she was not an assistant

general counsel as the Committee thought.  Additionally, she

would have wanted to address any misunderstanding about her

willingness to attend the meeting, her alleged attempt to have

her job description changed, or the timing of her Notice.

Second, the Committee failed to provide any means for

McCarthy to seek review, or reconsideration, of the Compensation

Committee's adverse benefit determination. Without such an

ability, McCarthy did not receive the full and fair review of her

claim to which she was entitled under ERISA. See 29 U.S.C. §

1133(2). There was neither an avenue for McCarthy to supplement

the administrative record, with the benefit of knowing the basis

for the initial denial, nor a process by which the Committee or

full Board[19] could consider such additional information. See §

2560.503-1(h)(2)(ii), (iv). These deficiencies prevented McCarthy

from being able to engage the Board in the kind of "meaningful

dialogue" called for by the regulations. See Booton v. Lockheed

Med. Ben. Plan, 110 F.3d 1461, 1463 (9th Cir. 1997); see also

---

[19] As noted earlier, the parties and the Employment Agreement
are not clear about whether the Committee or the Board is the
plan administrator for the Employment Agreement.

51

Lafleur v. La. Health Serv. and Indem. Co., 563 F.3d 148, 156 (5th Cir. 2009); Gilbertson v. Allied Signal, Inc., 328 F.3d 625, 635 (10th Cir. 2003). While it is true that the Board consisted of the same members as the Compensation Committee with one addition - Fels - at the very least an appeal might have provided an opportunity to respond.

Third, the Board failed to provide McCarthy access to documents relevant to her claim; most importantly the Katten memorandum. See § 2560.503-1(h)(2)(iii). Once McCarthy had been notified of the Board's denial of her claim, her attorney inquired about appeal rights and made a request for all the information upon which the Committee relied in making its decision. McCarthy never received a response, yet another violation of the § 503 regulations, specifically the disclosure rules.

## 4. Conflicts of Interest

Plaintiff argues that a structural conflict of interest tainted CGI's decision-making process and actual bias plagued the decision-makers themselves.

### (a) Structural Conflicts of Interest

The Supreme Court has held that a reviewing court should consider a conflict of interest arising from the dual role of an entity as an ERISA plan administrator and payer of plan benefits as "a factor in determining whether the plan administrator has

abused its discretion in denying benefits." <u>MetLife Ins. Co. v.</u>
<u>Glenn</u>, 554 U.S. 105, 108 (2008); <u>see also</u> <u>Firestone Tire & Rubber</u>
<u>Co. v. Bruch</u>, 489 U.S. 101, 115 (1989)(holding that even where a
plan gives discretion to an administrator or fiduciary a conflict
of interest should "be weighed as a factor in determining whether
there is an abuse of discretion" (internal quotation marks
omitted)).  The Court continues, "Any one factor will act as a
tiebreaker when the other factors are closely balanced, the
degree of closeness necessary depending upon the tiebreaking
factor's inherent or case-specific importance.  The conflict of
interest . . . should prove more important (perhaps of great
importance) where circumstances suggest a higher likelihood that
it affected the benefits decision . . . It should prove less
important (perhaps to the vanishing point) where the
administrator has taken active steps to reduce potential bias and
to promote accuracy." <u>Glenn</u>, 554 U.S. at 117.  "Courts are duty-
bound to inquire into what steps a plan administrator has taken
[if any] to insulate the decision-making process against the
potentially pernicious effects of structural conflicts." <u>Cusson</u>
<u>v. Liberty Life Assur. Co. of Boston</u>, 592 F.3d 215, 224 (1st Cir.
2010).

During trial, the defense conceded that there was a
structural conflict of interest inherent in CGI's decision-making
process because CGI's Committee was acting as plan administrator,

determining McCarthy's claim for benefits, and would have had to
pay Plaintiff's unfunded-plan benefits out of its profits.[20]

Defendants argue, however, that the lack of a fiduciary
relationship between the Committee and the plaintiff, due to the
plan's classification as "top hat," eliminates the concern about
structural conflicts.  However, putting on a top hat doesn't mean
you can forget the conflict tails.  Defendants have cited no case
that has held that a plan's status as a top hat would vitiate the
need for a conflicts analysis.  <u>Firestone's</u> holding applies
regardless of whether a plan is funded or unfunded.  <u>See</u>
<u>Firestone</u>, 489 U.S. at 115.  Not surprisingly, the Ninth and
Third Circuits, as well as several district courts, have
considered conflicts in a plan administrator's review of a top
hat plan.  <u>See, e.g.</u>, <u>Sznewajs v. U.S. Bancorp Amended and</u>
<u>Restated Supplemental Benefits Plan</u>, 572 F.3d 727, 733 (9th Cir.
2009)(considered whether the administrator operated under a
conflict of interest even though the plan at issue was a top hat
plan); <u>Goldstein v. Johnson & Johnson</u>, 251 F.3d 433 (3rd Cir.
2001)(same); <u>Scipio v. United Nat. Bankshares, Inc.</u>, 284 F. Supp.
2d 411, 419 (N.D. W. Va. 2003)(same).

---

[20]"We're also conceding that there were institutional – I
mean, this decision was to be made by the company, and the
company would obviously have its own interests, and it was an
inherent part of the structure."

As such, the structural conflict of interest in the instant case - CGI's $100,000,000 financial incentive to deny Plaintiff's claim - must be factored into this Court's decision. This conflict of interest fundamentally undermines the integrity of the Committee's decision-making process, in part, because CGI took no steps to mitigate the effects of this conflict by "walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decision-making irrespective of whom the inaccuracy benefits," for example. <u>Glenn</u>, 554 U.S. at 117.

**(b) Actual Conflict of Interest**

**(1) Claim of Katten-Mouse Investigation**

First, Plaintiff argues that CGI paid Katten to search for ways to deny McCarthy's claim, and CGI's Committee then relied on Katten's biased memorandum to justify its decision. Defendants concede that Katten was not hired to be a neutral investigator. Instead Mapfre hired the firm to serve as its counsel, and it operated under the direction of Mapfre's counsel, Claudio Ramos, with whom it had numerous email communications before and after retention.

As defendant points out, neither the ERISA statute nor the 2007 Employment Agreement requires an investigation by the administrator. <u>See</u> <u>Pinto v. Reliance Standard Life Ins. Co.</u>, 214 F.3d 377, 394 n.8 (3rd Cir. 2000)("Our focus on process should

not be read to require an additional duty to conduct a good faith, reasonable investigation. That is, we are not holding that Reliance Standard had a duty to gather more information, merely that the decision might have been arbitrary and capricious given the information available."); Ciarlone v. Lincoln Nat'l Life Ins. Co., No. 07-11803-GAO, 2009 WL 1010849, at *5 (D. Mass. Apr. 6, 2009)(holding that the plan administrator "was not required to assume the plaintiff's responsibility for fact-gathering"); Arsenault v. Metro. Life Ins. Co., No. 03-133-PB, 2004 DNH 143, 2004 WL 2203453, at *9 (D.N.H. Oct. 1, 2004)("[P]lan administrator is not required to conduct an independent investigation to determine whether or not an employee is capable of performing the material duties of his or her job."). Instead, the claimant bears the burden of demonstrating her entitlement to benefits. See Morales-Alejandro v. Medical Card Systems, Inc., 486 F.3d 693, 700 (1st Cir. 2007). Thus, actual bias or bad faith, which would prompt the court to set-aside the Committee's decision, is not proven simply with evidence showing that CGI did not conduct a perfect investigation into McCarthy's underlying claims. See Noonan v. Staples, Inc., 556 F.3d 20, 34-35 (1st Cir. 2009)(finding that "Staples may have been wiser to conduct yet another, even more searching investigation into [terminated employee's] conduct"; however, Staples did not act arbitrarily in

deciding that dozens of inflated expense reports show willful misconduct by employee).

That said, reliance on a *biased* investigation designed not to find the truth but to assemble facts that will support a denial of benefits demonstrates arbitrary decision-making. In Buffonge v. Prudential Ins. Co. of Am., 426 F.3d 20, 30 (1st Cir. 2005), the First Circuit held that "willingness to rely on a report [defendant] knew or should have known to be misleading, and its mischaracterization of the conclusions of [plaintiff's doctor]" indicates arbitrary decision-making. See also Conrad v. Reliance Standard Life Ins. Co., 292 F. Supp. 2d 233, 238-239 (D. Mass. 2003)(finding that the administrator acted arbitrarily and capriciously where it relied upon reports reflecting "palpable bias in favor of rejecting the claim").

Plaintiff contends that Katten's investigation was deficient and biased. While investigating the extent of Plaintiff's public company responsibilities, Katten interviewed Fels and Becker and sorted through thousands of McCarthy's emails, all of the documents saved on her work computer, and years of legal bills from CGI's outside counsel. McCarthy testified during trial that Katten should have looked beyond her emails, documents, and Nutter's legal bills into the shared document H-drive and CGI's corporate records for evidence of her public company responsibilities. However, at trial Plaintiff did not produce

the "stacks and stacks" of documents that Katten allegedly should have examined and didn't.  Thus, she has not proven that the document search itself was biased or flawed.

Conversely, Plaintiff successfully argues that the memorandum underestimated her public company responsibilities by (1) measuring the importance of her SEC work primarily based on a calculation of what percentage of her total emails related to public company work, and (2) minimizing that very calculation by implementing a search that spanned from 2001 to 2008, even though her securities-related duties only began in 2006, and (3) dissecting the email she wrote on April 11, 2008 to her then-supervisor Ermilio listing her significant accomplishments for the prior year[21] as if it were a comprehensive job description. The Katten memorandum concluded that McCarthy did do some SEC work but that the work was "minimal as [sic] best."  Katten did not recognize McCarthy's non-insurance, corporate commercial law duties of which the firm was aware when the memo stated, McCarthy "appears to be an insurance regulatory practitioner."

However, based on McCarthy's and Ermilio's testimony, as well as the record as a whole, the Court agrees that McCarthy's public company responsibilities were not her primary duties.  In other words, updating committee charters, attending meetings, and

---

[21]McCarthy lists three items: Her work on the Mapfre regulatory approvals, Massachusetts Auto competitive ratings, and out-of-state insurance regulation.

creating a director training program that sat on the shelf, were not among the most valuable tasks McCarthy provided to CGI. Still, Plaintiff has demonstrated that these responsibilities were not "minimal."  In particular, McCarthy's implementation of § 302-related internal controls within her department, her review of 8-K filings, and her seat on the Strategy Committee amount to public company-related work worthy of consideration.

Additionally, Plaintiff presented convincing evidence that some of the Katten investigators themselves were actually biased against Plaintiff.  For example, Katten attorney, Edward Rayner, suggested to McCarthy's attorney that McCarthy's "veracity" was at issue.  Shortly thereafter, Rayner emailed a colleague looking for ways to minimize McCarthy's efforts on CGI's Corporate Governance Guidelines; he wrote, "This would make her and her lawyer look, in legal terms, stupid."  Also on June 20, 2008, Marc Tract responded to an email from Claudio Ramos reporting that few SEC operations were carried out by McCarthy by saying, "This is helpful, and tends to show that both Ermilio and McCarthy can thank Mapfre for giving them the SEC training they now claim they have."  The Court finds that Katten did not begin with a blank slate, which is not surprising since Fels told the Katten team that McCarthy's claims were bogus almost from the getgo.

### (2) Board Members

Plaintiff argues that the key decision-makers on the Compensation Committee – namely, Andres Jimenez, Javier Fernandez-Cid, and Esteban Tejera – were personally and improperly motivated to deny McCarthy's claim for benefits.

There is persuasive evidence that the Compensation Committee members continually sought to avoid a $100 million payout as a result of Good Reason claims, and, as such, were improperly motivated to deny McCarthy's claim. At the behest of Andres Jimenez, Mapfre pressed for the adoption of a Retention Plan to replace the 2007 Employment Agreement. The Retention Plan would effectively waive those officers' Good Reason rights to resign due to changes occurring as a result of the merger – the very claim McCarthy presented here. Even when Fels refused to make such a waiver a condition of the merger, Jimenez requested a signed statement from each of the key executives stating their commitment to carrying out their executive duties for a reasonable period of time post-merger. Mapfre's pressure throughout the merger negotiations is evidence of a strong desire to avoid a possible payout of up to $100 million. Notably, before McCarthy's claim was decided, the Compensation Committee executives requested a detailed, employee-by-employee, calculation of the potential exposure for Good Reason claims from Cathleen Moynihan, and Claudio Ramos emailed Jimenez with a

breakdown of the benefits specifically due McCarthy and Ermilio should their claims be granted.  This flurry of email activity supplemented the Katten memo's calculation.

This campaign to avoid a $100 million payout suggests actual bias when considered along with the fact that the Committee members each had a personal financial stake in CGI's 2008 bottom line, however small.  Jimenez, Fernandez-Cid, and Tejera individually received incentive compensation based upon the financial performance of the Mapfre Group, which included CGI, although, for Fernandez-Cid and Jimenez this amounted to nominal compensation.[22]

Evidence that the Committee's decision was improperly influenced by those conflicts prompts the Court to weigh such conflict more heavily.  Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 117 (2008)("The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision.").  CGI made no attempt to insulate the Committee from these conflicts through its claims procedure.  Thus, these conflicts cast doubt on the integrity of the Committee's decision-making process.

---

[22]No evidence was submitted regarding Domingo Sugranyes's compensation.

## 5. **Prejudice**

Claimant must demonstrate how a plan's flawed procedure prejudiced review of her claim. See, e.g., DiGregorio v. Hartford Comprehensive Employee Benefit Srv. Co., 423 F.3d 6, 16 (1st Cir. 2005). While Plaintiff and Defendant debate the nuances of the prejudice requirement, the First Circuit has held that procedural irregularities constitute prejudice when they are "serious," have "a connection to the substantive decision reached," and "call into question the integrity of the benefits-denial decision itself." Bard v. Boston Shipping Ass'n, 471 F.3d 229, 244 (1st Cir. 2006)(finding prejudice when the Plan did not comply with a single notice provision after deeming the claimant ineligible to apply for benefits – no reasons given for the rejection, no information regarding how claimant could perfect the claim, and a defective appeals process in that the same Board heard both the initial claim and the appeal). Plaintiff need not prove that a different outcome would have resulted had the Committee followed the required procedures. See Buffonge, 426 F.3d at 30 (1st Cir. 2005)(rejecting defendants' argument that "an administrator's arbitrary analysis should be ignored if the end result – denial of benefits – can nonetheless be saved by a single valid piece of evidence that supports it"). However, that law does not impose strict liability for procedural failures either. For example, technical violations of ERISA do not

necessarily impact the substantive decision; substantial
compliance with the statute and regulations is sufficient. <u>See</u>
<u>Terry v. Bayer Corp.</u>, 145 F.3d 28, 39 (1st Cir. 1998); <u>Recupero</u>
<u>v. New England Tel. and Tel. Co.</u>, 118 F.3d 820, 840 (1st Cir.
1997)("We conclude that allowing a claim for relief because of
inadequacy of formal notice without any showing that a precisely
correct form of notice would have made a difference would result
in benefit claims outcomes inconsistent with ERISA aims of
providing secure funding of employee benefit plans.").

The procedural flaws here - the failure to provide reasons
for denial or any appeal process - when coupled with the conflict
of interest, a biased investigation, and Fels's mistaken
misrepresentation to the Committee that McCarthy had "no" public
company work at all - call into question the denial of benefits
here.  This was no technical violation of ERISA.  Not only did
the Compensation Committee neglect to provide even the bare-bones
of ERISA's core procedural protections, but the Compensation
Committee also failed to grapple with the most difficult
questions presented in McCarthy's Good Reason claim.

Among the most important issues upon which the Committee
should have deliberated is McCarthy's second Good Reason claim -
her diminishment of status or prestige.  From McCarthy's
perspective, after the merger McCarthy would no longer report
directly to the ultimate decision-makers at CGI, the "two head

honchos" - Fels and Ermilio.  Despite McCarthy's presentation on this issue, the Compensation Committee summarily dismissed it with little discussion or guidance from Katten.  In fact, the Katten memo did not address McCarthy's status and prestige at all.  As a result, the Committee members assumed that the merger would only increase McCarthy's prestige as she was now part of an international conglomerate, Mapfre S.A.  McCarthy was never provided with the opportunity to present more information about the impact of the merger on her status and prestige as an attorney in the United States marketplace.

If given this opportunity, James Ermilio,[23] who supervised her public-company work, would have reported that McCarthy derived a significant amount of status and prestige from her public company role, despite the "relatively small" component of her overall responsibilities such duties made up.  In particular, Ermilio would have noted McCarthy's role on the 8-K Committee and Strategy Committee, her contribution to the § 302 certifications, and the inherent prestige associated with her designation as a Section 16 officer.[24]  Like McCarthy, Ermilio filed his own Good

_____

[23]Ermilio testified during trial that he would have agreed to speak with the Compensation Committee on McCarthy's behalf had he been asked, even though he chose not to meet with the Committee regarding his own claim.

[24]A significant portion of McCarthy's Good Reason claim was based on her work for the nominating, compliance, and audit committees - all required by the SOX legislation.  She believed these committees would be eliminated or at least significantly changed post-merger.  Yet, at the time, it was an open question

Reason Notice because he felt a similar diminishment in status in that he no longer had "a seat at the table of the ultimate decision-makers of a publicly traded corporation.  With that came, in my view, very clear status in the legal profession, and with it . . . significant liability."  Ermilio's opinion on Plaintiff's status and prestige would have been especially informative because he built the in-house legal department from the ground up.  When he joined CGI in 1998, the company used outside counsel almost exclusively.

Additionally, if McCarthy had been provided an appeals or review process, she may have called upon a specialist in the management of in-house corporate law departments to speak on her behalf.[25]  According to Plaintiff's proffer on the matter, her expert, who reviewed the relevant documents in this case, would have given his opinion on the public profile of a Section 16 officer and the difference, from the viewpoint of the legal

_____

as to whether McCarthy's substantive work on these committees would have changed after CGI became a private subsidiary.  In fact, CGI did not cease corporate compliance activities after the merger because the company considered them to be "best practices."  Ermilio, still, would have reported that the "lion's share" of McCarthy's status and prestige would have been eliminated because the company no longer had to worry about strict compliance with SEC regulations.  Nevertheless, the Committee did not debate, or even consider, this wide-open question.

[25]Plaintiff made a proffer regarding the expert testimony of Joel Henning, a specialist in this area.  Defendants raise challenges to Joel Henning's qualifications, which the Court need not address.

community, between an in-house counsel working for a publicly traded parent versus a wholly owned private subsidiary of a foreign parent.

That said, Mapfre's perspective is understandable since the merger would have made McCarthy a top lawyer in a bigger pond. In fact, even Ermilio acknowledged, "In terms of prestige, I considered a prestige associated with CGI as being greater than status with a subsidiary; but you could argue that given her role as General Counsel of the subsidiary, you could argue that was more prestigious than being second in command for the parent company . . . It's a big fish/small pond type analogy that you hear people make. And, you know, being a general counsel of a subsidiary versus second in command of a parent, you could argue – it's in the eyes of the beholder, I suppose."

However, this decision cannot turn on the subjective perceptions of either the Committee or McCarthy alone. See Bader v. RHI Refractories Am., Inc., 111 Fed. Appx. 117, 121 (3rd Cir. 2004)(holding that because the acquisition of claimant's company in no way changed his position except according to his personal perceptions and conjectures, the denial decision was not arbitrary and capricious); see also Liston v. Unum Corp. Officer Severance Plan, 330 F.3d 19, 25 (1st Cir. 2003)(holding that claimant's abstract, subjective statements about the reduction in her responsibilities do not alone make the administrator's

ultimate decision "arbitrary").  Courts look for objective indicators to determine whether, in fact, a claimant's standing has been reduced.  See Dabertin v. HCR Manor Care, Inc., 373 F.3d 822, 828-29 (7th Cir. 2004)(holding that administrator acted arbitrarily and capriciously by determining that employee, who had lost $6 million in independent spending authority and control over one of her two divisions, did not suffer significant reduction in scope of authority); Worth v. Huntington Bancshares, Inc., No. 52861, 1987 WL 25694, at *16 (Ohio App. 8th Dist. Nov. 25, 1987)(rejecting claimant's argument that his subjective appraisal of his diminishment in status was the proper standard in favor of an objective definition - "status in a business organization is one's importance to the business of the organization in comparison to that of others . . . [as] reasonably perceived by others knowledgeable about the business organization").  Thus, at the very least, the Compensation Committee members would have benefitted from the give-and-take of further deliberation on the difficult, and close, status-and-prestige issue.

Therefore, the procedural flaws, coupled with the actual and structural bias, prejudiced the plaintiff by failing to provide a fair and complete process for evaluating her Good Reason claim. The procedural defects made a difference in the substantive quality of the Committee's analysis.

## 6. **Remedy**

ERISA gives the court a broad range of equitable power to redress violations of ERISA. Among other things, this provision allows courts

> (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3). The Court has the power to either remand to the plan administrator or award benefits to the claimant following de novo review. See Buffonge, 426 F.3d at 31 (citing Cook v. Liberty Life Assur. Co., 320 F.3d 11, 24 (1st Cir. 2003)). The Court has "considerable discretion" in crafting a remedy after finding a mistake in the denial of benefits. Id.

In Buffonge, the First Circuit determined that remand is most appropriate when the claimant was not "clearly entitled" to the denied benefits, but rather, the problem was with "the integrity of [the Plan's] decision-making process." Id. In such cases, "[t]he appropriate response is to let [claimant] have the benefit of an untainted process." Id. However, the First Circuit noted that there was no evidence that the plan administrator "intentionally set up a biased process." Id. at 32 n.15. Here the process was not neutral, so crafting a remedy is difficult.

Remand is the appropriate judicial remedy in this case because, on the merits, the outcome is not clear and the parties

agreed that the CGI Board would make the ultimate decision even after the merger with Mapfre seemed likely. The Court recognizes that the composition of the CGI Board is substantially the same as it was when McCarthy's claim was first denied in 2008,[26] but remand is not futile because, at this time, all of the Section 16 and non-Section 16 officers' Good Reason rights have expired. Mapfre is no longer facing a possible payout of over $100 million. As such, the most severe structural conflict has been ameliorated. Moreover, the Committee will have the opportunity to interview or review the testimony of Mr. Ermilio who has the best understanding of her duties because he was her supervisor.

To ensure there is no taint from the prior investigation, the defendant CGI is ordered to hire a neutral judge or law firm (at CGI's expense) that must be approved by the court. The firm shall have no ties to CGI, Mapfre or plaintiff. Mapfre shall not have any role in the selection of the neutral investigator and shall not interfere with the decision of the CGI Committee or Board of Directors. The court bars the Committee from considering the Katten memorandum. The neutral investigator shall make a report to the Compensation Committee which shall be made available to plaintiff. If there is a denial, the

---

[26]One additional Mapfre-affiliated board member has been added since 2008, George Prescott. Currently, Javier Fernandez-Cide, Domingo Sugranyes, Esteban Tejera, George Prescott, Gerry Fels, and Jamie Tamayo make up the Board.

Compensation Committee shall give notice to Plaintiff of the reasons. She may seek reconsideration by the Committee or to the full Board. This process comports with the Supreme Court's dicta in Glenn, suggesting that plan administrators mitigate the effects of conflict by "walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decision-making irrespective of whom the inaccuracy benefits." Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 117 (2008). Thus, a remand is justified under these circumstances.

### 7. Discussion on § 510 Claim

Plaintiff's second claim for relief in this action falls under 29 U.S.C. § 1140 ("Section 510"). Plaintiff claims that Mapfre, as parent company to CGI, violated § 510 when it wrongfully interfered with Plaintiff's claim for benefits under the 2007 Employment Agreement.

According to § 510,

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan.

29 U.S.C. § 1140.

To survive defendant's 12(b)(6) Motion to Dismiss Count VI against Mapfre for § 510 interference, Plaintiff must establish a three-prong prima facie case. Plaintiff must present sufficient

evidence that she (1) is entitled to ERISA's protection, (2) was subjected to a prohibited adverse action by Mapfre; and (3) there was a causal connection between her protected conduct and the adverse action.  See Barbour v. Dynamics Research Corp., 63 F.3d 32, 38 (1st Cir. 1995).  To prove § 510 "interference" at trial, Plaintiff must make an additional showing.  Plaintiff must prove that Mapfre's actions were made with the specific intent to interfere with her benefits.  Id. at 39.

In bringing this claim, Plaintiff has made sufficient allegations, in order to survive a motion to dismiss, that Mapfre interfered with Plaintiff's claim for benefits by improperly directing the Katten investigation.  However, at trial, Plaintiff failed to prove that Mapfre interfered with Plaintiff's claim for benefits in 2008 by instructing Katten to reach a pre-ordained result - denial.  To that point, Plaintiff argues that the defendants are improperly withholding 115 Claim-Related Documents that McCarthy is entitled to review under ERISA, including fifteen emails sent between Katten and Claudio Ramos on June 17, the day before Katten distributed its memo to the Board. However, this communication is privileged as between Mapfre's in-house counsel, Claudio Ramos (the client), and the company's (admittedly) non-neutral legal adviser, Katten.  This Court's previous order to release everything before the decision-making committee - the facts of her employment and the investigatory

directives - does not extend to this attorney-client privileged material.  No exception to the privilege applies, including implied or selective waiver.  Plaintiff has not proven improper interference from the sheer frequency and timing of Ramos's communications with Katten.  As such, Plaintiff has failed to provide sufficient evidence of a § 510 violation.

## ATTORNEYS FEES

Plaintiff is entitled to an award of reasonable attorneys' fees.  See Hardt v. Reliance Standard Life Ins. Co., 130 S. Ct. 2149, 2158 (2010)("[A] fees claimant must show 'some degree of success on merits' before a court may award attorney's fees under § 1132(g)(1).").

## CONCLUSION

The Court orders that judgment be entered in favor of Plaintiff against CGI and remands to the plan administrator for proceedings consistent with this opinion.  A petition for reasonable attorneys fees shall be filed within 30 days, CGI shall propose a neutral investigator within 30 days, and Plaintiff will have ten days to file an objection to the nomination.  The Court orders Entry of Judgment in favor of Defendant Mapfre.


/s/ Patti B. Saris
Patti B. Saris
United States District Judge